635 F.2d 1037
 1980-81 Trade Cases 63,690
 FAIRDALE FARMS, INC., Plaintiff-Appellant-Cross-Appellee,
v.
YANKEE MILK, INC. and Regional Cooperative Marketing Agency,
Inc., Defendants-Appellees-Cross-Appellants.
 Nos. 1128, 1412 and 1413, Dockets 80-7028, 80-7034 and 80-7036.
 United States Court of Appeals,
Second Circuit.
 Argued June 16, 1980.
Decided Dec. 9, 1980.
 
 Frederick U. Conard, Jr., Hartford, Conn. (Shipman & Goodwin, Hartford, Conn., H. Martyn Owen, Theodore M. Space, Thomas D. Clifford & Peter W. Benner, Hartford, Conn., on the brief), for defendant-appellee-cross-appellant Yankee Milk, Inc.
 Fred I. Parker, Middlebury, Vt. (Langrock, Sperry, Parker & Stahl, Susan Humphrey, Middlebury, Vt., and Chapman & Clearwaters, Keith I. Clearwaters and Dudley H. Chapman, Washington, D. C., on the brief), for plaintiff-appellant-cross-appellee.
 David P. O'Hara, Syracuse, N. Y. (Bond, Schoeneck & King, Syracuse, N. Y., John M. Freyer and David R. Sheridan, Syracuse, N. Y., on the brief), for defendant-appellee-cross-appellant Regional Cooperative Marketing Agency, Inc.
 Andrea Limmer, Washington, D. C. (Sanford M. Litvack, Asst. Atty. Gen., and Barry Grossman, Washington, D. C., on the brief), for the U. S. amicus curiae.
 Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and NICKERSON, District Judge.*
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 This is a certified appeal under 28 U.S.C. § 1292(b) from a decision and order of Judge Coffrin of the United States District Court for the District of Vermont. Plaintiff Fairdale Farms, Inc. appeals from the summary dismissal of its claim under section 1 of the Sherman Act, 15 U.S.C. § 1, that defendants Yankee Milk, Inc. and Regional Cooperative Marketing Agency, Inc. (RCMA) illegally fixed raw milk prices. Yankee and RCMA appeal from the denial of their summary judgment motions to dismiss plaintiff's claim that defendants monopolized and attempted to monopolize trade in raw milk in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.
 
 
 2
 We affirm that part of the order granting defendants summary judgment on the section 1 claim. We vacate that portion of the order dealing with the section 2 claim and remand to the district court for further proceedings consistent with this opinion.
 
 
 3
 Plaintiff Fairdale is both a producer and dealer-processor of milk. It is located near Bennington, Vermont and buys and sells in the Vermont, New York, and Massachusetts area. Yankee is a milk producers cooperative with a membership of approximately 6,000 New England farmers. In 1973 minimum dairy prices for the northeastern United States, set by the government under the Agricultural Marketing Agreements Act of 1937, 7 U.S.C. § 608c(5), were not providing an adequate return to the farmers. In order to secure prices with which their members could live, Yankee and six other area cooperatives organized RCMA as an agricultural cooperative marketing corporation, whose primary function was to establish prices for the member farmers' milk. Between 1973 and 1975, these prices were usually higher than the federal order prices. Since August 1975, RCMA has not established an over-order price.
 
 
 4
 Until 1974, Fairdale bought a large portion of its milk from Yankee members. However, in 1974 Fairdale objected to paying the over-order price and, when negotiations with defendants proved fruitless, discontinued its purchases from Yankee farmers. In 1976, Fairdale brought this suit charging defendants with price fixing, monopolizing, and attempting to monopolize. Defendants alleged as an affirmative defense that the Capper-Volstead Act, 7 U.S.C. §§ 291-292, protected them against liability for the conduct of which Fairdale complained.[1] The adequacy of this defense is the issue on appeal.
 
 The Section 1 Count
 
 5
 Price fixing arrangements are generally held to be per se violations of section 1 of the Sherman Act. White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963). The Capper-Volstead Act provides, however, that farmers may act together in associations in collectively marketing their goods, and the associations may make the necessary contracts to effect this purpose.[2] Fairdale does not contest Yankee's right under the Act to fix the prices its members charge. Confronted with Justice Black's opinion in Maryland and Virginia Milk Producers Association v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), Fairdale does not have much choice. Examining the legislative history of Capper-Volstead, Justice Black found that Congress intended to permit farmers to organize together to "fix prices at which their cooperative will sell their produce." Id. at 466, 80 S.Ct. at 853.
 
 
 6
 Fairdale contends, however, that RCMA does not have the same price-fixing right as does Yankee, and advances two arguments in support of its contention. It asserts first that Capper-Volstead gives only single cooperatives, not associations of cooperatives, the right to fix prices. Second, it contends that a cooperative association organized for the sole purpose of fixing prices is not entitled to Capper-Volstead protection. The district court rejected both contentions for reasons with which we agree.
 
 
 7
 The Capper-Volstead Act permits the formation of "associations" which may perform marketing functions and which may have "marketing agencies in common." The district court concluded that RCMA was one or the other of these organizations and that "grave legal consequences" should not be visited upon it as the result of a de minimis organizational distinction. Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 29, 82 S.Ct. 1130, 1135, 8 L.Ed.2d 305 (1962). See Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., 497 F.2d 203, 213-17 (9th Cir.), cert. denied, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). Fairdale's first argument is based upon a misreading of the Act and was properly rejected by the district court.
 
 
 8
 Fairdale's second argument is predicated upon a hyper-technical reading of the statute. Capper-Volstead provides that farmers may act together in associations in collectively "processing, preparing for market, handling, and marketing" their products. Fairdale contends that RCMA must do more than just fix prices in order to get the benefit of this statute. In the only two prior proceedings in which this argument was made, it was rejected. Northern California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative, 413 F.Supp. 984, 992 (N.D.Cal.1976), aff'd, 580 F.2d 369 (9th Cir. 1978) (per curiam), cert. denied, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); Central California Lettuce Producers Cooperative, (1977) Trade Reg. Rep. (CCH) P 21,337 (FTC). The establishment of price is an integral part of marketing. Id. at 21,237. It would be strange indeed if participation in this portion of the marketing process, standing alone, would subject a cooperative to antitrust liability, when the exercise of the full range of activities covered by Capper-Volstead would not. Northern California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative, supra, 413 F.Supp. at 992.
 
 
 9
 We agree with the district court that Fairdale had no section 1 claim against the defendants. The district court did not err in granting the defendants' motion for summary judgment on this claim.
 
 The Section 2 Count
 
 10
 Section 2 of the Sherman Act makes it unlawful for any person to monopolize, attempt to monopolize, or conspire with another to monopolize, trade. There is an inherent conflict between this provision and those of Capper-Volstead which legitimize the collective action of farmers in the marketing of their products. By exempting farmers from Sherman Act limitations on the ability to combine into cooperatives, Capper-Volstead gives farmers the right to combine into cooperative monopolies. The Act places no limits on combination; it does not forbid farmers from combining after their cooperative reaches a certain size. For a court to impose such limits and hold cooperatives liable for treble damages if they run afoul of a judicial standard would discourage the growth of these cooperatives. The Capper-Volstead Act recognizes that farmer cooperatives may grow into monopolies and includes precautions to prevent abuse of monopoly power. Section 2 of the Act, 7 U.S.C. § 292, permits the Secretary of Agriculture to order a cooperative to cease and desist if it monopolizes or restrains trade "to such an extent that the price of any agricultural product is unduly enhanced by reason thereof...." (emphasis added).
 
 
 11
 The district judge "(disagreed) with defendants' assertion that the Capper-Volstead Act adds to the elements of a monopoly claim when it is brought against a qualified cooperative," and stated that "a plaintiff claiming an agricultural cooperative has violated section 2 has no greater burden than if he sued a corporation." Disregarding the fundamental differences between a cooperative and a corporation, the district judge subscribed to the corporate monopolization test of United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966), which proscribes the willful acquisition of monopoly power that is not the result of "a superior product, business acumen, or historic accident." We believe that the district court misconstrued the congressional intent evidenced in Capper-Volstead.
 
 
 12
 Although agricultural cooperatives have existed in the United States since the early 1800's, until the twentieth century they were mostly small local organizations with little power to bargain effectively on behalf of their members. Moreover, their growth was inhibited by both state and federal antitrust laws. Maryland and Virginia Milk Producers Association v. United States, supra, 362 U.S. at 464, 80 S.Ct. at 852. See generally Note, Trust Busting Down on the Farm: Narrowing the Scope of Antitrust Exemptions for Agricultural Cooperatives, 61 Va.L.Rev. 341 (1975). When the Sherman Act was under consideration in 1890, an amendment was proposed that would have exempted agricultural cooperatives from the proscriptions of the Act. Although Senator Sherman did not believe that his bill applied to farmers' associations, he apparently was willing to accept the amendment. However, without explanation, it was deleted from the bill as enacted. See 1 Kintner, Federal Antitrust Law §§ 4.8, 4.9, 4.12 (1980). Whatever the reason for deletion, the Sherman Act, as interpreted by the Supreme Court, see Loewe v. Lawlor, 208 U.S. 274, 301, 28 S.Ct. 301, 309, 52 L.Ed. 488 (1908), was a strong deterrent to the development of large agricultural cooperatives.
 
 
 13
 The tremendous growth of the California fruit industry brought about a drastic change in the merchandising of farm commodities. When California growers discovered the advantages of collectively processing and marketing their perishable fruit, large-scale, single commodity cooperatives quickly assumed a dominant role in the industry. See, e.g., Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra, 370 U.S. at 28-29, 82 S.Ct. at 1135. Shortly after World War I, the concept of large-scale, cooperative commodity marketing began to spread to other parts of the country. Wheat, cotton, and tobacco growers, in particular, became involved in the regional commodity cooperative movement. Knapp, The Advance of American Cooperative Enterprise 7-12 (1973). See Liberty Warehouse Co. v. Burley Tobacco Growers' Co-Operative Marketing Association, 276 U.S. 71, 48 S.Ct. 291, 72 L.Ed. 473 (1928). Legislatures in many states enacted enabling statutes excepting organizations of this type from the coverage of state antitrust laws. Tigner v. Texas, 310 U.S. 141, 145-47, 60 S.Ct. 879, 881, 84 L.Ed. 1124 (1940). The American Cotton Association was organized in 1919, and in 1920 a plan for the organization of state marketing cooperatives was adopted. An essential element of this plan, and one of the " '8' commandments of 'commodity cooperative marketing' ", was that each cooperative should "control a sufficient proportion of the entire crop to be a dominant factor in the market...." Knapp, supra, at 9.
 
 
 14
 Congress was not unaware of what was taking place. Senator Walsh, the most vociferous opponent of Capper-Volstead's anti-Sherman features, directed the attention of his colleagues specifically to the fact that 93 per cent of California's raisin growers were members of the Sun Maid Raisin Growers Association. See 62 Cong.Rec. 2164 (1922). Senator Capper pointed to the 1,100 member California Fruit Growers Exchange as the "type of cooperative that would find 'definite legalization' " under Capper-Volstead. Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra, 370 U.S. at 28, 82 S.Ct. at 1135. Clearly, cooperatives "of such size and general activities" were contemplated by the proposed Act. Id. at 29, 82 S.Ct. at 1135. Proponents of Capper-Volstead, the prototype of which was introduced in 1919, see H.R. 7783 and S. 845, 66th Cong., 1st Sess. (1919), were convinced that farmers needed congressional help and, if there was any doubt on this score, it was dispelled by the severe agricultural depression of 1920.
 
 
 15
 In the presidential election of 1920, both party platforms stressed the need for legislative protection of the cooperative movement. In 1921, Congress organized a Joint Commission of Agricultural Inquiry to investigate, among other things, the causes of the agricultural depression and the reason for the difference between the prices paid farmers and costs to consumers. Among the Commission's recommendations was the enactment of legislation to strengthen the legal position of cooperatives. Knapp, supra, at 21.
 
 
 16
 A national Agricultural Conference was convened by the Secretary of Agriculture in January 1922, at which President Harding spoke. He assured the conferees that they would be afforded "ample provision of law under which they (might) carry on in cooperative fashion those business operations which lend themselves to that method...." Id. at 23. The Conference's Committee on the Marketing of Farm Products recommended "the formation of strongly organized cooperative associations of farmers, preferably on a commodity basis." Id. at 24.
 
 
 17
 It is little wonder, then, that Capper-Volstead and the major pieces of farm legislation that followed it strongly supported the cooperative movement. In Capper-Volstead, Congress did not simply broaden the scope of section 6 of the Clayton Act, 15 U.S.C. § 17, so as to bring cooperatives issuing capital stock within that section's antitrust exemptions. Where section 6 spoke only in terms of cooperative purposes, i.e., "mutual help", Capper-Volstead spelled out the broad range of activities in which the cooperative might engage, i. e., "processing, preparing for market, handling, and marketing." See National Broiler Marketing Assn. v. United States, 436 U.S. 816, 824-25, 98 S.Ct. 2122, 2128, 56 L.Ed.2d 728 (1978).
 
 
 18
 In the Cooperative Marketing Act of 1926, 44 Stat. 802 (1926) (current version at 7 U.S.C. §§ 451-457), Congress authorized the Secretary of Agriculture to establish a division of cooperative marketing. 44 Stat. 802. That division was to render services to agricultural cooperatives, to confer and advise with producers desirous of forming cooperatives, and to promote the knowledge of cooperative principles. Id. at 802. Cooperative associations were also authorized to exchange and disseminate market and economic information among themselves. Id. at 803.
 
 
 19
 The declared policy of the Agricultural Marketing Act of 1929, 46 Stat. 11 (1929) (current version at 12 U.S.C. §§ 1141-1141j), was to promote the effective merchandising of agricultural commodities "so that the industry of agriculture (would) be placed on a basis of economic equality with other industries...." 46 Stat. 11. This would be accomplished in part "by encouraging the organization of producers into effective associations or corporations under their own control for greater unity of effort in marketing and by promoting the establishment and financing of a farm marketing system of producer-owned and producer-controlled cooperative associations and other agencies." Id. The Federal Farm Board, created by the Act, was authorized to make loans to cooperatives to assist them in "extending" their membership by educating producers in the advantages of cooperative marketing. Id. at 14. If, in the judgment of the Board, the producers of any commodity were "not organized into cooperative associations representative of the commodity", the Board was authorized to make the benefits of the Act available to other cooperatives dealing in the same commodity. Id. at 18.[3]
 
 
 20
 The Farm Credit Act of 1933, 48 Stat. 257 (1933), authorized the creation of twelve "Banks for Cooperatives", which were authorized to make loans to cooperative associations for most of the purposes set forth in the Agricultural Marketing Act. 48 Stat. 257. Specifically included within these purposes was the "effective merchandising of agricultural commodities." Id. at 265.
 
 
 21
 As late as 1968, with the enactment of the Agricultural Fair Practices Act, Pub.L. No. 90-288, 82 Stat. 93 (1968) (current version at 7 U.S.C. §§ 2301-2306), Congress continued to recognize the need for stronger and more effective marketing and bargaining associations of farmers. See (1968) U.S.Code Cong. & Ad.News pp. 1867, 1869. Congress declared that the "marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law", 82 Stat. 93, and forbade any coercive practices by handlers which would interfere with the farmers' exercise of this right. Id. at 94. See Butz v. Lawson Milk Co., 386 F.Supp. 227, 235 (N.D.Ohio 1974).[4]
 
 
 22
 It is apparent from these statutes that agricultural cooperatives were "a favorite child of Congressional policy." 5 Toulmin, Antitrust Laws § 6.1, at 334 (1950); Stark v. Brannan, 82 F.Supp. 614, 617 (D.D.C.1949). "Moreover, there is persuasive evidence that Congress' concern for protecting contract growers vis-a-vis processors and handlers has not abated." National Broiler Marketing Assn. v. United States, supra, 436 U.S. at 837, 98 S.Ct. at 2134 (Brennan, J., concurring). The consistent tenor of the enactments shows that Congress wanted and expected farmers to be represented by strong and effective cooperatives, so extensively organized as to be representative of individual commodities. Unity of effort was encouraged in order to give farmers the same "unified competitive advantage" available to businessmen acting through corporations. Maryland and Virginia Milk Producers Association v. United States, supra, 362 U.S. at 466, 80 S.Ct. at 853. As Senator Capper himself expressed it, when he successfully opposed Senator Walsh's proposed amendment to Capper-Volstead that would have prohibited the creation of cooperative monopolies, see S.Rep.No. 236, 67th Cong., 1st Sess. (1921), "no association can efficiently operate that does not control and handle a substantial part of a given commodity in the locality where it operates." 62 Cong.Rec. 2058 (1922).
 
 
 23
 In short, when Congress enacted the Capper-Volstead Act, it did not intend to prohibit the voluntary and natural growth that agricultural cooperatives needed to accomplish their assigned purpose of effective farmer representation. That farmers' legitimate desires for unity of effort would incorporate of necessity a concept of corporate aggrandizement did not per se make this method of cooperative growth illegal. See United States v. Rock Royal Co-Operative, Inc., supra, 307 U.S. at 560, 59 S.Ct. at 1006.
 
 
 24
 This is the interpretation that has been placed upon Capper-Volstead by practically every scholar in the antitrust field.[5] This is how those courts which have directly addressed the issue have construed the Act. In Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra, 370 U.S. at 24, 82 S.Ct. at 1133, the Court noted with apparent approval that portion of the district court's charge which stated that cooperatives could lawfully have a monopoly of the fruit and products in which they dealt.[6] In Maryland and Virginia Milk Producers Association v. United States, supra, 362 U.S. at 465, 80 S.Ct. at 852, the Court said that farmers might act together in cooperative associations without the associations as such being illegal under the antitrust laws "as they otherwise might have been." Justice White expressed the same thought when he said that "(t)he assistance offered farmers by the Capper-Volstead Act was to allow combination in a way that would otherwise violate the antitrust laws," and concluded that the end result was a "bilateral monopoly" that benefited both the producer and the consumer. National Broiler Marketing Assn. v. United States, supra, 436 U.S. at 842, 98 S.Ct. at 2137 (White, J., dissenting). See also Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra, 497 F.2d at 216 n.11; Sunkist Growers, Inc. v. F.T.C., 464 F.Supp. 302, 309 (C.D.Cal.1979); Shoenberg Farms, Inc. v. Denver Milk Producers, Inc., 231 F.Supp. 266, 268 (D.Colo.1964); Cape Cod Food Products, Inc. v. National Cranberry Ass'n, 119 F.Supp. 900, 907 (D.Mass.1954); United States v. Dairy Co-Op Ass'n, 49 F.Supp. 475 (D.Ore.1943); United States v. King, 250 F. 908, 910 (D.Mass.1916).
 
 
 25
 Even the Federal Trade Commission, ever in the vanguard of the attack on monopolization, has stated that if an agricultural cooperative attains a monopoly position (even 100 percent) "without resort to predatory or anti-competitive practices, but through natural growth or the voluntary affiliation with or attraction of new members, no illegality would attach." See Hearings on Antitrust Aspects of Food Price Increases Before the Sub-Comm. on Monopolies and Commercial Law of the House Comm. on the Judiciary, 93rd Cong., 1st Sess. 715 (1973).
 
 
 26
 Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment, Otto Milk Co. v. United Dairy Farmers Cooperative Association, 388 F.2d 789, 797 (3d Cir. 1967), boycotts, North Texas Producers Association v. Metzger Dairies, Inc., 348 F.2d 189, 195-96 (5th Cir. 1965), cert. denied, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966), coerced membership, see Gulf Coast Shrimpers and Oystermans Association v. United States, 236 F.2d 658, 665 (5th Cir.), cert. denied, 352 U.S. 927, 77 S.Ct. 225, 1 L.Ed.2d 162 (1956), and discriminatory pricing, Knuth v. Erie-Crawford Dairy Cooperative Association, 395 F.2d 420, 423-24 (2d Cir. 1968). Neither may it use its legitimately acquired monopoly power in such a manner as to stifle or smother competition. Maryland and Virginia Milk Producers Association v. United States, supra, 362 U.S. at 463, 80 S.Ct. at 851.
 
 
 27
 "(M)any anticompetitive actions are possible or effective only if taken by a firm that dominates its smaller rivals. A classic illustration is an insistence that those who wish to secure a firm's services cease dealing with its competitors. Such conduct is illegal when taken by a monopolist because it tends to destroy competition, although in the hands of a smaller market participant it might be considered harmless, or even 'honestly industrial.' " Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 274 (2d Cir. 1979), cert. denied, 100 S.Ct. 1061, 444 U.S. 1093, 62 L.Ed.2d 783 (1980) (citations omitted).
 
 
 28
 In refusing to dismiss the section 2 claims, the district court relied on Grinnell v. United States, supra, which stated the following requirements for a monopolization claim:The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.
 
 
 29
 384 U.S. at 570-71, 86 S.Ct. at 1703. Our review of the above authorities persuades us that the effect of Capper-Volstead is to prevent the full application of the second element of this test to agricultural cooperatives. Capper-Volstead permits the formation of such cooperatives and places no limitation on their size. As the cooperative grows, so, normally, does its power over the market. Thus, while the formation, growth and operation of a powerful cooperative is obviously a "willful acquisition or maintenance of such power," and will rarely result from "a superior product, business acumen, or historic accident," id., it is exactly what Capper-Volstead permits.
 
 
 30
 We conclude that Grinnell does not apply to monopoly power that results from such acts as the formation, growth and combination of agricultural cooperatives, but applies only to the acquisition of such power by other, predatory means. It is not a violation of the Sherman Act for the members of an agricultural cooperative to carry out the legitimate objectives of their association which follow naturally from their attempts to achieve unity of effort and the voluntary elimination of competition among themselves. Maryland and Virginia Milk Producers Association v. United States, supra, 362 U.S. at 465, 80 S.Ct. at 852. See Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 635, 95 S.Ct. 1830, 1841, 44 L.Ed.2d 418 (1975).
 
 
 31
 That part of the district court's order which granted defendants summary judgment on plaintiff's claim of a section 1 Sherman Act violation is affirmed. Because it is not clear whether the district court denied defendants' motion for summary judgment dismissing the section 2 count on the premise that the mere accretion of power from formation of a cooperative is sufficient to violate that section or on the ground that predatory acts had been sufficiently shown, that part of the order is vacated, and the matter is remanded to the district court for reconsideration consistent with the principles set forth in this opinion. We express no opinion concerning the district court's ultimate resolution of this portion of defendants' summary judgment application.[7]
 
 
 
 *
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 Defendants also asserted a counterclaim against Fairdale for alleged violation of the Agricultural Fair Practices Act of 1967, 7 U.S.C. §§ 2301-2306. The district court's dismissal of this counterclaim is not being considered on this appeal
 
 
 [2]
 The pertinent provisions of the Capper-Volstead Act read:
 Persons engaged in the production of agricultural products ... may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes....
 7 U.S.C. § 291.
 Capper-Volstead was an enlargement of section 6 of the Clayton Act, 15 U.S.C. § 17, which provided:
 Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of ... agricultural ... organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.
 
 
 [3]
 The first chairman of the Farm Board promptly declared that "(t)he Board believes that it can be of great assistance to American farmers by encouraging the development of large-scale, central cooperative organizations." Knapp, supra, at 123
 
 
 [4]
 See also
 a) the Agricultural Adjustment Act of 1933, § 8(2), 48 Stat. 34 (1933) (current version at 7 U.S.C. §§ 601-604, 607-623), which empowered the Secretary of Agriculture to enter into marketing agreements with associations of producers, such agreements not to be held in violation of the antitrust laws;
 b) the Agricultural Adjustment Act of 1935, § 16(b)(1), 49 Stat. 767 (1935), requiring the Secretary of Agriculture to accord such recognition and encouragement to producer-owned and producer-controlled cooperatives as would be in harmony with the policy toward such cooperatives already set by Congress, see United States v. Rock Royal Co-Operative, Inc., 307 U.S. 533, 562-64, 59 S.Ct. 993, 1007, 83 L.Ed. 1446 (1939);
 c) the Robinson-Patman Anti-Discrimination Act, § 4, 49 Stat. 1528 (1936) (current version at 15 U.S.C. §§ 13, 13a, 13b, 21a), which permitted cooperatives to return net earnings and surplus to their members, producers and consumers in proportion to their purchases or sales;
 d) the Motor Carrier Act, 1935, § 203(b), 49 Stat. 545 (1935), which exempted motor vehicles controlled and operated by cooperative associations from most of the Act's provisions;
 e) the 1939 Internal Revenue Code, § 101(12)(A), 53 Stat. 33-34 (1939) (current version at 26 U.S.C. § 521), which exempted certain farmers cooperatives from taxation;
 f) the Investment Company Amendments Act of 1970, § 27(c), 84 Stat. 1435 (1970), which exempted certain farmers cooperatives from the registration requirements of the Act;
 g) the National Agricultural Marketing and Bargaining Act of 1971, 9 Harv.J.Leg. 498 (1972) (proposed but not enacted).
 
 
 [5]
 See 1 Areeda & Turner, Antitrust Law P 228d (1978); 1 Callman, The Law of Unfair Competition Trade Marks and Monopolies § 15.2(a) (1967 & Cum.Supp. 1979); 2 Kintner, Federal Antitrust Law § 17.5, at 517-18 (1980); Mueller, The National Antitrust Commission: Implications for Cooperatives, No. 37 (Dept. of Agricultural Economics, University of Wisconsin-Madison, September 1979); 5 Toulmin, Antitrust Laws § 6.13 (1950); 7 Von Kalinowski, Antitrust Laws and Trade Regulations § 51.08(3)(b) (1980); Hufstedler, A Prediction: The Exemption Favoring Agricultural Cooperatives Will Be Reaffirmed, 22 Ad.L.Rev. 455, 460 (1969-1970)
 
 
 [6]
 The district court actually charged that "(t)he defendant Sunkist is permitted under the law to acquire a legal monopoly over product Valencia oranges that are available for processing into citrus juice products, including single-strength Valencia juice." Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1, 19 (9th Cir. 1960), rev'd, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962)
 
 
 [7]
 There are those who contend that the economics of farming have changed so drastically in recent years through farm growth and mechanization that the Capper-Volstead Act is no longer needed to equalize bargaining power. See Toulmin, supra note 5, at 334; Note, Trust Busting Down on the Farm: Narrowing the Scope of Antitrust Exemptions for Agricultural Cooperatives, 61 Va.L.Rev. 341, 381-89 (1975). It is for Congress, not the courts, to determine whether there is sufficient merit in this argument to warrant a redesign of the statute