UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

DAIRYMEN, INC., Defendant-Appellee, Cross-Appellant.

Nos. 79–3438, 79–3439.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1981.

Decided Sept. 21, 1981.

Rehearing Denied Dec. 22, 1981. Rehearing and Rehearing En Banc Denied Feb. 10, 1982.

Nancy C. Garrison, U. S. Dept. of Justice, Robert B. Nicholson, Antitrust Div., Appellate Section, Barry Grossman, Washington, D. C., for the U. S.

D. Paul Alagia, Barnett & Alagia, Joseph M. Day, Ronald L. Gaffney, Louisville, Ky., Morton Hollander, William A. Carey, John F. Sherlock, III, William S. Glading, Barnett, Alagia & Carey, Washington, D. C., for Dairymen, Inc.

Before JONES, Circuit Judge, CECIL, Senior Circuit Judge and BERTELSMAN,[*] District Judge.

## PER CURIAM.

The United States appeals from a judgment dismissing that portion of its action which alleged that Dairymen, Inc. (D.I.) attempted to monopolize the market in Grade A milk in the Southeastern United States. D.I. appeals from that portion of the district court's judgment which held that it violated Section 3 of the Clayton Act by requiring its milk haulers to enter exclusive hauling contracts.⁕

D.I. is an agricultural cooperative marketing association of dairy farmers which markets Grade A milk in the Southeastern United States. The Government alleged that D.I. used its market power to attempt to monopolize the market in Grade A milk. Its complaint asserted that D.I.: (1) forced milk processors to execute full supply and committed supply contracts to eliminate competitors from the market in violation of Section 3 of the Clayton Act; (2) imposed exclusive dealing contracts on its milk haulers; (3) foreclosed competition by acquiring customers from its competitors; (4) pooled milk without regard to the profits or losses which resulted from pooling; and (5) used restrictive membership agreements. The Government sought to enjoin D.I. from continuing these practices.

The district court found that D.I. entered into 91 full supply or committed supply agreements with milk processors.[1] In order to secure these agreements, D.I. threatened to withhold milk from several processors.[2] D.I. also required milk haulers in Indiana and in Nashville, Tennessee, to haul milk for D.I. exclusively. The reason D.I. gave for imposing exclusive hauling contracts was to prevent the comingling of its members' milk with lower quality milk.

The district court dismissed the attempt to monopolize charge because the Government failed to prove that D.I.'s anticompetitive practices rose to the level of predatory trade practices and because the Government failed to prove that there was a dangerous probability that a monopoly would result from D.I.'s practices. It found that D.I.'s exclusive hauling contracts were over restrictive and enjoined their use. The court also found that D.I.'s membership agreements, which required those joining the cooperative to remain members for two

* Honorable William O. Bertelsman, United States District Court for the Eastern District of Kentucky, sitting by designation.

1. Full supply contracts required processors to purchase all their Grade A milk from D.I. except for the amount of milk furnished by independent producers prior to the date of the contract. The committed supply contracts required processors to purchase the same amount of milk from D.I. as they had in the past. These contracts also contained "price equalization charges" which penalized processors who purchased less than 95% of their milk from D.I.

2. These threats were unsuccessful against two dairies which filed private antitrust actions and who were granted temporary restraining orders which prevented D.I. from withholding milk.

years, were not unreasonable. Finally, the district court found that D.I.'s pooling practices in Mississippi were illegal, but it did not issue an injunction because there was no probability that these practices would recur.

In this appeal the Government contends that the district court erred in holding that the Capper-Volstead Act, 7 U.S.C. §§ 291, 292, and Section 6 of the Clayton Act, 15 U.S.C. § 17, exempt agricultural cooperatives from liability for attempts to monopolize unless their anticompetitive conduct is deemed "predatory." We agree.

■ The Capper-Volstead Act[3] was intended to permit agricultural producers to join together to process, prepare, and market agricultural products without fear of prosecution under the antitrust laws. It permits an agricultural cooperative to be formed solely to fix the price at which its members products are sold. *Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop.*, 413 F.Supp. 984 (N.D.Cal. 1976), *aff'd*, 580 F.2d 369 (9th Cir. 1978) *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979). Two or more cooperatives can voluntarily join together solely for the purpose of setting uniform prices for their members. *Id.; Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.) *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). As a result, an agricultural cooperative can willfully attain a monopoly through the voluntary enrollment of its members, or through a voluntary combination with other cooperatives. The mere accretion of monopoly power through voluntary combination is immunized by the Capper-Volstead Act.[4] *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980).

The use of the term "predatory practices" in cases construing the Capper-Volstead Act is intended to distinguish monopolies acquired through anticompetitive practices from lawful accretions of market power willfully created through the voluntary enrollment of members of cooperatives. In *Maryland and Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), the Supreme Court reversed the district court's dismissal of an action under Section 2 of the Sherman Act and stated that the Capper-Volstead Act "did not leave cooperatives free to engage in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative." 362 U.S. at 467, 80 S.Ct. at 854. The Second Circuit has also cautioned that "a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment . . . boycotts . . . coerced membership . . . and discriminatory pricing. *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, supra at 1044.

■ In this case the district court set too high a burden on the Government when it required the Government to show that D.I.'s practices rose to the level of predatory practices, *i. e.*, anticompetitive practices without any business justification. The offense of attempt to monopolize requires only that the defendant has engaged in anticompetitive conduct with a specific intent to monopolize and that there was a dangerous probability that the attempt would be successful. *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *see also Northeastern Telephone Co. v. American*

3. Section 1 of the Capper-Volstead Act, 7 U.S.C. § 291, provides in pertinent part:

Persons engaged in the production of agricultural products as . . . dairymen . . . may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling and marketing in interstate and foreign commerce, such products of persons so en-

gaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes. . . .

4. This immunity is subject to the Secretary of Agriculture's authority to order a cooperative association to cease and desist from monopolization. 7 U.S.C. § 292.

Telephone & Telegraph Co., 651 F.2d 76, 85 (2d Cir. 1981); Kearney and Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 598 (7th Cir. 1971) cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). The district court did not determine whether D.I. used its full supply and committed supply contracts and exclusive hauling contracts with the specific intent to monopolize, and it is necessary to remand this case for that determination.

Although there is evidence of economic justification for the use of full supply and committed supply contracts, the question of intent is paramount. An anticompetitive practice may have economic justification, but its use may be undertaken with unlawful intent and in the desire to achieve an unlawful goal. On remand the district court should determine whether there were less exclusionary methods in which D.I. could achieve its legitimate goals. However, the most important inquiry is whether these contracts were intended to stifle competition or were intended to meet legitimate business purposes.

The district court rejected the Government's proposed geographic submarkets because it believed this type of analysis was not required under Section 2 of the Sherman Act, unlike the inquiry made under Section 7 of the Clayton Act. However in United States v. Paramount Pictures, Inc., 334 U.S. 131, 173, 68 S.Ct. 915, 936–937, 92 L.Ed. 1260 (1948), the Supreme Court stated that Section 2 of the Sherman Act "condemns monopoly of 'any part' of trade of commerce. 'Any part' is construed to mean an appreciable part of interstate or foreign trade or commerce." In addition, in International Boxing Club of New York, Inc. v. United States, 358 U.S. 242, 251, 79 S.Ct. 245, 251, 3 L.Ed.2d 270 (1959) the Supreme

Court specifically noted that the Sherman Act is applied to "localized geographic area[s]." On remand the district court should determine the relevant geographic submarkets on the basis of commercially significant areas in which D.I. operated and in which D.I.'s customers could turn to other suppliers. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). Once this factual determination is made it will be possible to evaluate whether D.I. ever achieved a dangerous probability of success of monopoly in any significant market.

After the district court determines the relevant geographic submarkets it will be possible to determine whether the full and committed supply contracts used by D.I. foreclose a substantial share of the market from its competitors[5] and "tend[s] to create a monopoly in any line of commerce" in violation of Section 3 of the Clayton Act.

■ There is no merit to D.I.'s contentions that the district court erred in holding that D.I.'s exclusive hauling contracts and pooling practices violated the antitrust laws.

AFFIRMED in part, REVERSED in part and REMANDED.

---

**5.** We note that in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 329, 81 S.Ct. 623, 629, 5 L.Ed.2d 580 (1961), a case which involved Section 3 of the Clayton Act, the Supreme Court stated:

To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relevant strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.