**FAIRDALE FARMS, INC.,**
**Plaintiff-Appellant,**

v.

**YANKEE MILK, INC. and Regional**
**Cooperative Marketing Agency,**
**Inc., Defendants-Appellees.**

**No. 813, Docket 82–7698.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 24, 1983.

Decided Aug. 8, 1983.

Certiorari Denied Jan. 9, 1984.
See 104 S.Ct. 711.

Susan F. Eaton, Middlebury, Vt. (Langrock, Sperry, Parker & Wool, Middlebury, Vt., and Chapman & Clearwaters, Wash-

ington, D.C., Fred I. Parker and Keith I. Clearwaters, Washington, D.C., of counsel), for plaintiff-appellant Fairdale Farms, Inc.

John M. Freyer, Syracuse, N.Y. (Bond, Schoeneck & King, Ronald C. Berger and Ronald G. Hull, Syracuse, N.Y., of counsel), for defendant-appellee Regional Co-op. Marketing Agency, Inc.

Frederick U. Conard, Jr., Hartford, Conn. (Shipman & Goodwin and Theodore M. Space, Hartford, Conn., of counsel), for defendant-appellee Yankee Milk, Inc.

Before LUMBARD, VAN GRAAFEI-LAND and PIERCE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Fairdale Farms, Inc. appeals from a summary judgment of the United States District Court for the District of Vermont (Albert W. Coffrin, J.) dismissing its antitrust complaint against appellees, Yankee Milk, Inc. and Regional Cooperative Marketing Agency, Inc. We affirm.

Appellant is a dairy products producer and processor located in Bennington, Vermont, which purchases raw milk from other producers in Bennington County, Berkshire County, Massachusetts, and Rensselaer County, New York. Appellee, Yankee Milk, is a dairy farmer cooperative with members in New England and eastern New York. Yankee and six other cooperatives in the New England-New York area are associated in the Regional Cooperative Marketing Agency, Inc. (RCMA). Since 1973, RCMA has acted as a common marketing agency for its members.

In 1975, Fairdale began this action against Yankee, alleging that Yankee and RCMA had conspired to fix the price of raw milk and had monopolized and attempted to monopolize the raw milk trade in the three county area in which Fairdale procures its milk, all in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976). Yankee joined RCMA as a necessary party. In 1979, the district court granted defendants' motions for summary judgment on the section 1 price-fixing claim but denied their motions on the section 2 monopolization

claim. The court certified the case for interlocutory appeal. 28 U.S.C. § 1292(b). This Court affirmed the district court's dismissal of the price-fixing claim, but vacated and remanded on the monopolization claim. *Fairdale Farms, Inc. v. Yankee Milk, Inc.,* 635 F.2d 1037 (2d Cir.1980), *cert. denied,* 454 U.S. 818, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981).

The district court had ruled that the latter claim was to be tested by the usual monopolization standards of *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). That case held that a claim under section 2 was made out if the plaintiff established "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Id.* at 570–71, 86 S.Ct. at 1703–04. We held that the effect of the Capper-Volstead Act, 7 U.S.C. §§ 291–92, "is to prevent the full application of the second element of this test to agricultural cooperatives," so that the acquisition, maintenance, or exercise of monopoly power by "predatory means" only was proscribed. 635 F.2d at 1045. Because we could not determine "whether the district court denied defendants' motion for summary judgment dismissing the section 2 count on the premise that the mere accretion of power from formation of a cooperative is sufficient to violate that section or on the ground that predatory acts had been sufficiently shown," *id.,* the order of denial was vacated and remanded for reconsideration. Upon remand and defendants' renewal of their motions for summary judgment, the district court dismissed the complaint, holding that plaintiff had raised no material questions of fact as to whether defendants had engaged in predatory conduct.

*RCMA Pricing Policies*

Appellant contends that RCMA set its over-order premium so high as to constitute a predatory policy. The over-order premium was the amount by which RCMA prices exceeded the market order minimum prices

set by the United States Department of Agriculture and State regulatory agencies. Relying in part upon our decision in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 294 (2d Cir.1979), *cert. denied,* 444 U.S. 1093 (1980), the district court properly rejected that argument. As we stated in *Berkey,* "there is probably no better way for [a monopolist] to guarantee that its dominance will be challenged than by greedily extracting the highest price it can." *Id.* It may be, as appellant contends, that market forces will not correct over-pricing in the cooperative milk trade as rapidly as they might in others. Congress wisely has protected against this possibility, however, by authorizing the Secretary of Agriculture to issue a cease and desist order against any monopolization by a cooperative which has "unduly enhanced" the price of any agricultural product. 7 U.S.C. § 292.

In enacting the Sherman Act, Congress recognized that the "reasonableness of prices has no constancy." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). "The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow," *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927), and courts are poorly equipped to undertake the "heavy, continuous, and unguided burden" of determining reasonableness, III Areeda and Turner, *Antitrust Law* ¶ 710, at 149 (1978); *see* Sullivan, *Handbook of the Law of Antitrust* 117–18 (1977). It is not surprising, therefore, that Congress did not ask the courts to determine "whether or not particular price-fixing schemes are wise or unwise, healthy or destructive." *Socony-Vacuum Oil Co., supra,* 310 U.S. at 221, 60 S.Ct. at 843. Instead, the Sherman Act makes every combination formed for the purpose of raising the price of a commodity illegal per se. *Id.* at 223, 60 S.Ct. at 844.

The Capper-Volstead Act was enacted to provide an exception from this rule for agricultural cooperatives. *Fairdale I, supra,* 635 F.2d at 1039. Had Congress intended that the federal courts were to act as regulatory bodies in setting upper monetary limits for this exception, it easily could have said so. It did not. Although the Capper-Volstead Act has not relieved us of our duty to outlaw "competition-stifling practices", *Maryland and Virginia Milk Producers Ass'n v. United States,* 362 U.S. 458, 463, 80 S.Ct. 847, 851, 4 L.Ed.2d 880 (1960), we fail to see how an increase in prices by an agricultural cooperative stifles competition by other cooperatives or individual farmers. Appellant's contention that appellees' imposition of over-order premiums constitutes a "predatory practice" against the consumer misinterprets the meaning of that phrase as it is used in *Fairdale I, supra,* 635 F.2d at 1044, and *United States v. Dairymen, Inc.,* 660 F.2d 192, 194 (6th Cir.1981). "Predatory practices", as discussed in those and similar cases, are not aimed at consumers, but at "an identifiable competitor or potential competitor or an identifiable group of them." *Sullivan, supra,* at 112. Although, in some instances, the charging of unremunerative prices may damage or destroy competition, *Northeastern Tel. Co. v. American Tel. and Tel. Co.,* 651 F.2d 76, 86 (2d Cir.1981), *cert. denied,* 455 U.S. 943 (1982), excessively high pricing hardly is likely to accomplish the same result.

We likewise find no merit in appellant's argument that appellees violated section 2 because they charged different premiums in the several milk-marketing areas which they served. The Secretary of Agriculture sets minimum milk prices for each federal marketing area which are not nationally uniform, nor, indeed, necessarily uniform within the marketing area itself, financial allowances being permitted for those producers in an area who provide an economic service or benefit to the handler. *Schepps Dairy, Inc. v. Bergland,* 628 F.2d 11, 15 (D.C.Cir.1979). However, producers are permitted to bargain with handlers for higher prices, or over-order premium charges. *Id.* A similar situation exists in State-regulated areas, one of which includes Berkshire County, Massachusetts.

The basic requirement for successful cooperative marketing is the control or han-

dling of a substantial part of a commodity in the market involved. *Fairdale I, supra,* 635 F.2d at 1041–43. It would be self-defeating for a cooperative to raise its prices when its share of the market is so small as to leave it without bargaining power. It is undisputed that appellees did not have the bargaining power in the large New York-New Jersey marketing area to enable them successfully to impose over-order premium charges. *See Zuber v. Allen,* 396 U.S. 168, 173 n. 4, 90 S.Ct. 314, 317 n. 4, 24 L.Ed.2d 345 (1969). Appellant contends, nonetheless, that appellees' failure to impose over-order premium charges in New York precluded them from imposing such charges in the New England marketing area. We disagree.

■ Governmentally defined marketing areas for fluid milk create natural boundaries for price differentials. Fairdale has made no showing that appellees' pricing in the New York-New Jersey market was below their cost or was designed in some manner to eliminate competition by predatory means. *See Areeda and Turner, supra,* ¶ 720, at 187. Absent any showing that appellees were moving milk from the New York marketing area into the New England marketing area to compete with Fairdale and given appellees' lack of bargaining power in the New York area, there was nothing predatory in the premium charges which appellees imposed uniformly in the Berkshire County area where appellant purchased milk. To hold otherwise would be to defeat the very purpose of the Capper-Volstead Act. *See Kinnett Dairies, Inc. v. Dairymen, Inc.,* 512 F.Supp. 608, 633–34 (M.D.Ga.1981); *GVF Cannery, Inc. v. California Tomato Growers Ass'n,* 511 F.Supp. 711, 715–16 (N.D.Cal.1981).

### Refusal to Deal

Yankee first began charging the RCMA premium to Fairdale in the second half of 1973. The premium was imposed at all relevant times only with respect to milk produced by Yankee members in Berkshire County. In the Spring of 1974, a New York handler, Normanskill Dairy, began preparations to enter the Berkshire market. By purchasing in New York, where the Government minimum price was lower than in Berkshire County and where RCMA could not impose its premium because of competition, Normanskill would be able to offer prices to potential Berkshire customers that were lower than those charged by Fairdale. Seeking to forestall this competition by lowering its own prices, Fairdale asked Yankee for an exemption from the RCMA premium. Yankee granted an exemption to Fairdale, but for one month only. When the premium was reimposed, Fairdale refused to pay it. Although Yankee warned Fairdale that it would cease to deliver any more milk unless the Berkshire premiums were paid, milk deliveries continued while the matter was being negotiated.

In December, 1974, Fairdale learned from two Yankee members that Yankee's management had ordered them to withhold milk deliveries to Fairdale. Upon inquiry, Fairdale learned that the order had been given in error and already had been rescinded. At the next negotiating session, Fairdale demanded that Yankee promise to give Fairdale forty-five days prior notice of any termination of its milk supply. Upon Yankee's refusal to give such assurance, Fairdale, professing its inability to live with resultant supply uncertainties, discontinued its relations with Yankee as of December 31, 1974.

■ Fairdale says Yankee's threat to sell it no more milk was a predatory practice. Because the dispute concerned only Yankee milk produced in Berkshire County, Fairdale contends Yankee had no reason to refuse to sell it milk purchased in Vermont and New York, about which there was no price dispute. Since only 40% of Fairdale's milk purchases were from Yankee, no reasonable contention can be made that Yankee was cutting Fairdale off from all sources of supply. Moreover, although Vermont producers were getting the Vermont Milk Control Board price, which included the equivalent of an RCMA premium, no such premium was charged in eastern New York, only a short distance from Benning-

ton. *See Kinnett Dairies, Inc. v. Dairymen, Inc., supra,* 512 F.Supp. at 624–25. Section 2 of the Sherman Act does not give purchasers the exclusive right to dictate the terms upon which they will deal. Yankee, which did not have a monopoly covering both the New York and New England areas, lawfully might refuse to sell to a purchaser which would not meet its terms of sale and which had other sources of supply available. *Kinnett Dairies, Inc. v. Dairymen, Inc., supra,* 512 F.Supp. at 632; *GVF Cannery, Inc. v. California Tomato Growers Ass'n, supra,* 511 F.Supp. at 716. Such conduct cannot be considered an unlawful use of lawfully acquired monopoly power. *See Fairdale I, supra,* 635 F.2d at 1044. If anything, Yankee's action in terminating all business relationships with Fairdale necessarily created an added market for its competitors. *House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867, 871 (2d Cir.1962).

Fairdale's argument that a processor who refuses to pay overdue premium charges nonetheless is entitled to forty-five days' notice before future deliveries can be cancelled, is specious. There is nothing predatory in terminating deliveries to a purchaser who refuses full payment therefor, particularly where other purchasers are required to and do pay the full price. As a matter of fact, it was not Yankee, but Fairdale, which terminated their business relationship, and it did so on one week's notice.

The judgment of the district court is affirmed.