**EWALD BROS., INC., a Minnesota corporation, Appellant,**

v.

**MID–AMERICA DAIRYMEN, INC., a Kansas corporation, Appellee.**

No. 88–5288.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1989.

Decided June 21, 1989.

Stanford Robins, Minneapolis, Minn., for appellant.

Wayne H. Hoecker, Kansas City, Mo., for appellee.

Before WOLLMAN and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Plaintiff Ewald Bros., Inc., a fluid milk bottler, appeals from the district court's grant of summary judgment in favor of defendant Mid–America Dairymen, Inc., a dairy cooperative. From 1968 through 1972, Ewald purchased a large portion of its unprocessed fluid milk requirements from Mid–America Dairymen and an asso-

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

ciation of cooperatives called Twin City Milk Producers Association, which merged with Mid–America Dairymen in 1970. Milk Producers participated in the "M–W Association," an association of dairy cooperatives from Minnesota and Wisconsin which met approximately once a month to set prices to be charged by members to processors such as Ewald. Milk Producers also participated in a standby pooling program, under which each member paid an assessment into a central fund, which was then used to purchase option contracts on unregulated milk, to allow members to obtain additional supplies of milk as needed to meet consumer demand.

Ewald originally brought suit in 1972, alleging defendant's activities violated both federal and state antitrust laws. In February, 1983, the Judicial Panel on Multidistrict Litigation transferred the case to the United States District Court for the Western District of Missouri for consolidated pretrial proceedings. Four years later, with discovery substantially completed, the case was remanded to the District of Minnesota. Upon remand, the parties filed an extensive stipulation of uncontroverted statements of fact, and defendant moved for summary judgment on the ground that its participation in both the M–W Association and the standby pool was protected by section 1 et seq. of the Capper–Volstead Act, 7 U.S.C. § 291 et seq., section 6 of the Clayton Act, 15 U.S.C. § 17, and Minnesota Statutes, § 325D.55(1). Plaintiff filed a cross-motion for summary judgment, claiming defendant's activities were not exempt but rather as a matter of law violated sections 1 et seq. and 2 of the Sherman Act, 15 U.S.C. §§ 1 et seq. and 2.

The district court[1] granted summary judgment in favor of defendant under sections 1 and 2 of the Sherman Act and dismissed plaintiff's pendent state law claims without prejudice. On appeal, plaintiff challenges the court's ruling that the standby pool is exempt from antitrust lia-

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

**1386**

bility, arguing that the participation of proprietary dairies in the pool precludes Capper–Volstead protection. Plaintiff further contends the standby pool was not operated for the legitimate purpose of assuring adequate reserve supplies of fluid milk, but rather was a tool for maintaining monopoly prices. Plaintiff urges this Court to reverse the district court's grant of Capper–Volstead immunity, and hold as a matter of law that defendant's activities constituted both a *per se* violation of section 1 of the Sherman Act[2] and a conspiracy to monopolize in violation of section 2.[3]

## I.

Section 6 of the Clayton Act, originally enacted in 1914, provides that the antitrust laws shall not be construed "to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit." 15 U.S.C. § 17. The effect of section 6 is that a group of farmers acting together in a single association cannot be restrained "from lawfully carrying out the legitimate objects" of their association, i.e., the collective marketing of farm products so as to improve economic conditions for individual farmers. *Id. See, e.g., Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 465, 80 S.Ct. 847–52, 4 L.Ed.2d 880 (1960); *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1182 (8th Cir.1982).

The Capper–Volstead Act of 1922 extended section 6 to capital stock agricultural cooperatives and specified that the "legitimate objects" of such cooperatives included the collective processing, preparing for market, handling, and marketing of products through marketing associations and through the making of "necessary contracts and agreements," provided that the association dealt primarily in products of its members. 7 U.S.C. § 291. *See Milk Producers Ass'n*, 362 U.S. at 466, 80 S.Ct.

at 853; *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1042 (2d Cir. 1980), *cert. denied*, 454 U.S. 818, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981). *See generally National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 822–26, 98 S.Ct. 2122, 2127–29, 56 L.Ed.2d 728 (1978).

Consistent with the legislative history of the 1922 Act, the Supreme Court has limited application of the Capper–Volstead exemption to farmers, and has refused to exempt organizations whose members included processors and packers as well as farmers. In *Case–Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967), the Court held Sunkist Growers, Inc., an organization of orange growers and fruit packing houses, could not claim Capper–Volstead immunity when approximately 15% of the membership was composed of private, for-profit fruit packing houses. *Id.* at 386–87, 88 S.Ct. at 529–31. Noting the "agency associations" formed by the for-profit packing houses participated in the control and policy making of Sunkist, the Court determined that "Congress did not intend to allow an organization with such nonproducer interests to avail itself of the Capper–Volstead exemption." *Id.* at 395–96, 88 S.Ct. at 534–35.

The Court again rejected the argument that the Act was intended to protect processors and packers or those "that must bear the costs and risks of a fluctuating market" in *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 826, 98 S.Ct. 2122, 2129, 56 L.Ed.2d 728 (1978). The *National Broiler* Court stated that Capper–Volstead would not apply to an association of poultry producers which included "even one" non-farmer processor as a member. *Id.* at 826–29, 98 S.Ct. at 2129–31.

Nonetheless, the Court has also ruled the exemption is not precluded by organizational distinctions that are of *de minimis* meaning and effect where the organization in reality is operated by farmers for the

---

**2.** Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts, combinations, or conspiracies in restraint of trade or commerce among the states or with foreign nations.

**3.** Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits every person from monopolizing, attempting to monopolize, or conspiring to monopolize commerce.

benefit of farmers. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 28–29, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962). *See Alexander v. National Farmers Organization*, 687 F.2d 1173, 1185 (8th Cir.1982) (*NFO*). Thus, in *NFO*, we held the $25 "dues" contributions of a handful of non-farmers did not prohibit the National Farmer's Organization from claiming Capper–Volstead immunity where the organization's bylaws specifically prohibited any non-farmer from asserting a membership interest and the organization was conducted exclusively for the benefit of true dairy farmers. *Id.* at 1186–87.[4]

We held in *NFO*, however, that even true cooperatives can lose Capper–Volstead protection if they engage in anticompetitive, predatory activities which are outside the "legitimate objects" of a cooperative. *Id.* at 1182–83. *See Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 468, 80 S.Ct. 847, 854, 4 L.Ed.2d 880 (1960); *United States v. Borden Co.*, 308 U.S. 188, 204–05, 60 S.Ct. 182, 191, 84 L.Ed. 181 (1939). We imposed liability in *NFO* where three major cooperatives, including the defendant herein, were shown to have conspired to eliminate a competing cooperative, the National Farmer's Organization, through a pattern of predatory, anticompetitive, and unlawful tactics. *NFO*, 687 F.2d at 1193–1208.

These tactics included discriminatory pricing, coercive supply disruptions and threats of similar conduct, bad faith harassment and threats of litigation against independent buyers of NFO milk, and refusals to acknowledge or honor termination notices from members; conduct which was accompanied by the deliberate suppression and destruction of documents by one of the cooperatives, Associated Milk Producers, Inc. *Id.* Viewing this conduct in its entirety, we held the cooperatives conspired with unlawful intent to eliminate competition through predatory and anticompetitive means, and hence lost their Capper–Volstead immunity. *Id.* at 1182–83, 1193.

In considering charges by the National Farmer's Organization that the milk pooling practices challenged by plaintiff herein were unlawful, however, the *NFO* Court affirmed the district court's judgment that the operation of the standby pool "served legitimate business purposes" and was important, at least in principle, to the stable supply of milk. *Id.* at 1206–07. *See In re Midwest Milk Monopolization Litigation*, 510 F.Supp. 381, 449–52 (W.D.Mo.1981) (district court findings of fact).

Ewald argues that while the *NFO* Court relieved the standby pool of antitrust liability because there was no evidence that members of the pool acted with the intent to eliminate competition or were otherwise linked to the anticompetitive conduct found to violate the antitrust laws, *id.* at 1193, 1207, the Court in *NFO* did not expressly consider the effect of the participation of the proprietary dairies in the pool. *See In re Midwest Milk*, 510 F.Supp. at 435, 502 & n. 29 (district court expressly declines to reach Capper–Volstead exemption claim by standby pool). *Cf. Case–Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 390 n. 6, 88 S.Ct. 528, 532 n. 6, 19 L.Ed.2d 621 (1967). To this issue we now turn.

## II.

To understand the structure and purpose of the standby pool, we draw upon the undisputed facts in this case and the facts relating to milk marketing in general as found by the district court in the *NFO* case. *See* 510 F.Supp. at 436–43. Milk is a perishable commodity. Unprocessed Grade A milk to be used as fresh fluid milk[5] must

---

4. The district court in the *NFO* case specifically found "there is no evidence in this case that any of the non-producer members of NFO had anything to do with the establishment of NFO's general policies or with NFO's involvement in the marketing of milk." *In re Midwest Milk Monopolization Litigation*, 510 F.Supp. 381, 425 (W.D.Mo.1981), *rev'd in part on other grounds*,

*Alexander v. National Farmers Organization*, 687 F.2d 1173 (8th Cir.1982).

5. Grade A milk is milk approved by individual state and/or local governmental authorities for sale as fluid milk for human consumption. Grade B milk, which has not been so approved, may only be used in manufacturing dairy prod-

move off the farm every 48 hours and cannot be commercially stored in inventory for more than 72 hours. Milk that is used in fluid products must pass additional sanitation regulation which requires special handling and special facilities at the farm and at the receiving plant.

The demand and supply cycles of milk are seasonal and do not correspond. Generally speaking, the volume of milk production is highest after calving season in the spring and early summer when pastures are more abundant. Consumer demand for fluid milk products is highest in the fall, when milk production is near its lowest point. Fluid milk processors need an adequate supply of unprocessed Grade A milk to produce fresh products at the times and in the quantities set by consumer demand. Manufacturing plants with the capacity of manufacturing unprocessed milk into a storable dairy product such as butter or cheese have been used to handle and market the unprocessed Grade A milk resulting from the difference between consumer demand for fluid milk and the dairy cows' production.

At all times material to this litigation, plaintiff Ewald was a fluid milk processor, engaged in the business of bottling milk and selling bottled milk and manufactured dairy products. Defendant Mid–America Dairymen collected, transported, processed, manufactured, distributed, and sold, on be-

half of its farmer-members, raw milk, fluid milk, and packaged and manufactured dairy products. From 1968 through 1972, Ewald purchased a large portion of its unprocessed fluid milk requirements from Mid–America Dairymen and Twin City Milk Producers Association.[6] These sales were regulated by Federal Milk Marketing Order No. 68, which included the Twin Cities metropolitan area and adjacent counties.[7]

Federal milk marketing orders establish a minimum price to be paid by handlers such as Ewald[8] for Grade A milk used as fluid milk (Class I price) and a lower minimum price for Grade A milk which is manufactured into dairy products (Class II price).[9] The regulations required Ewald to pay at least the federal order minimum price for the milk it purchased, depending on how the milk was utilized. While processors pay for fluid milk under the market order based upon its use classification, farmer-producers are paid a "uniform price" or "blend price," which represents an average of the minimum prices by applicable use classifications for the milk sold under the regulations of the market order.

Milk from a supply plant[10] was regulated under Order 68 if the supply plant disposed of at least 15% of the milk receipts from farmer-producers within the area of the order each month and, in addition, a certain percentage was disposed of as Class I fluid milk or was delivered every

ucts. Only Grade A milk is regulated and priced under the Federal Order System.

6. The "original" or first Mid–America Dairymen, Inc., was formed on July 1, 1967. From 1968 through 1970, numerous cooperatives were merged with, consolidated with, or acquired by Mid–America. On April 1, 1970, Mid–America merged with Twin City Milk Producers Association.

7. A federal milk marketing order is an order issued by the United States Department of Agriculture pursuant to 7 U.S.C. § 608c upon the petition and approval of dairy farmers in the proposed marketing area.

8. A "handler" generally is defined as the operator of a plant which receives Grade A milk either for sale or distribution as fluid milk products in the regulated marketing area or for resale as raw milk to a regulated handler who sells or distributes fluid milk products.

9. The lower Class II price for milk manufactured into dairy products is related to the price paid for unregulated Grade B milk, which is also manufactured into dairy products. The higher Class I price is designed to reflect Grade A milk production costs, supply and demand for fluid milk, and the cost of transportation. The minimum prices in each market order vary. Class I minimum prices are lowest in the Minnesota and Wisconsin federal order markets and generally increase, with distance, from those markets.

10. A "supply plant" is either a reload facility or a manufacturing plant which receives milk from milk haulers, who pick up the milk from farmers on a daily basis. The supply plant reships fluid milk to a regulated distributing plant.

month to a regulated plant. Unregulated raw milk was penalized by being given the lowest possible classification in the order and by special treatment of its butterfat differentials.

Minnesota and Wisconsin dairy farmers produce more milk than can be consumed in the immediate area, and in the early to mid–1960's, the existence of substantial supplies of Grade A fluid milk in Minnesota and Wisconsin was a depressing factor on milk prices in this area. During this time, sellers of fluid milk produced in Minnesota and Wisconsin sold such milk to plants in other geographic areas (generally southward) where the net return would be increased.

Defendant's activities affected this distribution scheme in two ways. In May, 1968, Mid–America Dairymen's predecessor, Twin City Milk Producers, joined with all other qualified Order 68 cooperatives in the M–W Association to set prices to be charged all handlers regulated on Order 68, including plaintiff Ewald. The M–W Association price for Class I milk was always above the federal order minimum price.[11] The difference, or "premium" was generally higher from the early summer through the fall when demand peaked, and ranged from 20 cents per cwt to 51 cents per cwt for sales inside Order 68.[12]

Defendant also participated through Twin City Milk Producers in a standby pool. The standby pool concept originated in the mid–1960's and was first implemented by an association of dairy cooperatives, Associated Dairymen, Inc. (ADI),[13] in September, 1967. Dairy cooperatives participated in the ADI standby pool by contributing an amount of money or "assessment" based on their production of fluid milk

products. The fund thus created was used to purchase options on unregulated Grade A milk that was regularly manufactured into cheese or other dairy products. The options allowed member cooperatives to acquire a supply of Grade A milk on short notice, which could be used to meet the seasonal demand for fluid milk. If the pool exercised the option, it would pay the option price, which was based on the Class I fluid milk price of a nearby federal order. If the pool did not exercise the option, the milk would be manufactured into a dairy product and the pool would pay the price of the option.

Each member cooperative participated in the management policy of the pool through a representative on ADI's Standby Pool Committee. The Standby Pool Committee recommended management policies to the ADI Board of Directors, which had ultimate legal authority and responsibility for managing the pool. The ADI Board delegated certain authority to an executive committee, which was also composed of representatives of participating cooperatives. The ADI standby pool entered into option contracts with two or three privately-owned, non-cooperative "proprietary" dairies, but the proprietary dairies were never members of the pool and the amount of milk under option from farmer-cooperative plants always exceeded that under option from the proprietary plants.

In 1970, the ADI standby pool was reorganized and incorporated as a separate entity, the Associated Reserve Standby Pool Cooperative (ARSPC). ARSPC was a federation of dairy cooperatives from the South and Midwest, including the defendant herein. ARSPC functions were direct-

---

11. Other courts have noted that the "the market order system does not purport to establish fair or reasonable prices—only minimum prices." *Kinnett Dairies, Inc. v. Dairymen, Inc.,* 512 F.Supp. 608, 633–34 (M.D.Ga.1981), *aff'd,* 715 F.2d 520 (11th Cir.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). Overorder or premium prices existed in federal order markets throughout the country during the 1960's and early 1970's. *See id.; Fairdale Farms, Inc. v. Yankee Milk, Inc.,* 635 F.2d 1037, 1038–39 (2d Cir.1980), *cert. denied,* 454 U.S. 818, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981). Plaintiff's

expert states, however, that overorder prices were "virtually nonexistent" in Order 68 until October, 1967. *See* Aff. of David L. Baumer, para. 8 & Ex. B.

12. The Association adopted a "two-price system," granting a credit to dealers for milk sales made out of the Order 68 marketing area.

13. ADI was formed in 1964 as a common marketing agency for cooperatives in federal orders ranging from Minnesota southward to Texas.

ed by its Board of Directors and Executive Committee, the members of which were representatives of ARSPC member cooperatives. Each ARSPC member cooperative had at least one Director on the Board of Directors and additional Directors based on sales of Class I fluid milk. The Executive Committee was composed of eight Directors. Like the ADI standby pool, ARSPC purchased options on milk from some proprietary plants, but no proprietary plant was a member or participated in the management of the pool and the amount of milk under option from farmer-cooperative plants always exceeded that under option from the proprietary plants.

## III.

Ewald concedes that the Capper–Volstead exemption allows dairy cooperatives such as defendant to join together to market their products and to set prices. Ewald argues, however, that the standby pool, which provided member cooperatives with a reserve supply of Grade A milk for fluid milk processing, loses its Capper–Volstead protection because the pool entered into option contracts with proprietary plants. We cannot agree.

It is undisputed that the proprietary plants were never members of the ADI standby pool or ARSPC. They were not represented on any governing or policy making board and did not participate in the management of the pool in any way. Section 291 of the Capper–Volstead Act expressly provides that exempt cooperatives "may make the necessary contracts and agreements" to collectively process and market their products, provided that "the association shall not deal in the products of non-members in an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291.

The number of option contracts which the standby pool entered into varied over the years, as did the volume of milk under contract, but both the ADI and the ARSPC pools always had options on a greater volume of milk from member cooperatives than from proprietary plants. When the

ADI pool initially started, for example, it had options on milk from eight dairy product manufacturing plants; only two of which were proprietary. Milk from these two proprietary plants accounted for 36.5% of the total volume of milk in the pool at that time. By November of 1971, ARSPC had option contracts with twenty-two plants, only four of which were proprietary. These four proprietary plants accounted for 27.75% of the volume of milk in the pool.[14]

Under these circumstances, we find the option contracts with proprietary dairies do not in and of themselves destroy the Capper–Volstead immunity for activities of ARSPC or the ADI standby pool. Membership in the ADI standby pool and ARSPC was entirely voluntary and was composed exclusively of farmer-cooperatives. The pools were managed by representatives of the cooperatives and were operated for their benefit by providing a ready supply of fluid milk which allowed members to respond to fluctuating consumer demand.

Ewald further argues, however, that the option contracts destroy Capper–Volstead immunity because the reserve function of the pool was an "after the fact invention by the various participating cooperatives as a consequence of anti-trust litigation by the Justice Department and the National Farmers Organization," and the "true purpose" of the standby pool was to allow the participating cooperatives to maintain the premium prices set by the M–W Association by eliminating competing sales of unregulated milk.

This argument was rejected in *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F.Supp. 608 (M.D.Ga.1981), *aff'd*, 715 F.2d 520 (11th Cir.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984), a case very similar to the case at bar. In *Kinnett Dairies*, a dairy processor sued a southern cooperative which was a member of ARSPC and of two other cooperative associations which set prices and marketed members' milk. *See id.* at 614–17. The essence of the plaintiff's charges was that

---

**14.** The highest volume of milk under option from proprietary plants was 41% in June, 1969.

the "network of arrangements" between the cooperative, ARSPC, and these other associations allowed the cooperative to maintain a premium price for Class I fluid milk. *Id.* at 643. The court expressly found there was a need to maintain a reserve supply of milk and that membership in the standby pool provided

> the means for obtaining dependable supplemental Grade A milk supplies at reasonable predetermined prices, thus eliminating the need to develop and maintain costly year-round local reserves. For ARSPC members, payments made to fund the option payments to the supply plants were like insurance payments to have milk available when needed.

*Id.* at 617. Finding no evidence of any "predatory" conduct nor any intent to stifle or smother competition, the court held the activities of the standby pool were entitled to the benefit of the Capper–Volstead exemption. *Id.* at 633, 642–43.

This Court has also ruled that ARSPC's activities did not violate sections 1 or 2 of the Sherman Act. We held in *NFO* that several large cooperatives, including the defendant herein, had unlawfully conspired to eliminate the National Farmer's Organization and other independents as competitors, but specifically excluded ARSPC as a participant in that conspiracy. *Alexander v. National Farmers Organization,* 687 F.2d 1173, 1207 (8th Cir.1982). Acknowledging the argument that the existence of the standby pools effectively reduced independent supplies of milk, we nonetheless found that ARSPC's pooling was important to providing a stable supply of milk and "served legitimate business purposes." *Id.* We thus affirmed the district court's express conclusion that ARSPC had not violated sections 1 or 2 of the Sherman Act, *see In re Midwest Milk,* 510 F.Supp. at 502–03 & n. 29, stating:

> ARSPC participated in [the formation and operation of the standby pool], but because we find no liability attaches to such practices, none can attach to ARSPC's participation.

687 F.2d at 1207. *See also National Farmers' Organization v. Associated Milk Producers, Inc.,* 850 F.2d 1286, 1289 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989).

Ewald attempts to distinguish *Kinnett Dairies* on the ground that the court utilized a different standard from that employed by the Eighth Circuit in *NFO.* The Eleventh Circuit majority specifically rejected that argument on appeal, however, finding the pool had not engaged in conduct which could be characterized as "predatory" in any sense of the word. *See Kinnett Dairies,* 715 F.2d at 520–21. Ewald further contends that the *NFO* Court held only that the pool was not linked to the discriminatory pricing, coercive supply disruptions, harassment, and other conduct found by the Court to violate the antitrust laws. But the *NFO* Court specifically mentioned the argument Ewald advances on appeal, namely, that the pool's purpose was to eliminate competing sales of unregulated milk so as to maintain premium prices, and directly held that the pool could not be liable because its activities "served legitimate business purposes." *NFO,* 687 F.2d at 1206–07.

Ewald's efforts to distinguish *Kinnett Dairies* and *NFO* must, therefore, be rejected. Ewald also argues, however, that because it was not a party in either case, this Court must evaluate defendant's summary judgment motion in view of the evidence Ewald has placed before the Court concerning the operation of the standby pool. This evidence consists of excerpts from a report prepared by economists from the antitrust division of the Justice Department; an affidavit from Ewald's own expert economist; excerpts from articles by the "father" of the standby pool concept, Charles L. Farr, and other supporters of the pool; and data on the percentage of unregulated milk which was under option, as well as the volume of milk which the pool actually called for during the period 1968 through 1972. Ewald contends that its burden, in response to defendant's summary judgment motion, is to create a genuine issue of material fact concerning the defendant's liability for activities of the standby pool.

As we held in *NFO*, the "overriding issue" in determining the liability of dairy cooperatives under the antitrust laws "is one of tactics and intent." *NFO*, 687 F.2d at 1206. *See United States v. Dairymen, Inc.*, 660 F.2d 192, 194–95 (6th Cir.1981). Viewing the evidence presented in the light most favorable to Ewald, *e.g., Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153, 1154 (8th Cir.1982), we nonetheless find that plaintiff's evidence fails to create a question of fact concerning whether operation of the pool was predatory, anticompetitive, and unlawful.

We note at the outset there is no evidence in this record of the type of predatory conduct or tactics which this Court and other courts have found to violate the antitrust laws when engaged in by cooperatives. There is no evidence of coerced membership, boycotts, picketing, bad faith harassment, or discriminatory pricing. *See NFO*, 687 F.2d at 1182, 1193–1208. *See generally Fairdale Farms*, 635 F.2d at 1044; *Treasure Valley Potato Bargaining Ass'n v. OreIda Foods, Inc.*, 497 F.2d 203, 216 (9th Cir.), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974); *Kinnett Dairies*, 512 F.Supp. at 642–43; *GVF Cannery, Inc. v. California Tomato Growers Ass'n*, 511 F.Supp. 711, 715–16 (N.D.Cal. 1981).

Moreover, while "even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act," *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 468, 80 S.Ct. 847, 854, 4 L.Ed.2d 880 (1960),[15] plaintiff's evidence simply does not support its contention that the standby pool's reserve function was solely an "after-the-fact invention." *See NFO*, 687 F.2d at 1193, 1206–07; *Kinnett Dairies*, 715 F.2d at 520–21 (citing district court opinion, 512 F.Supp. at 521).

The report prepared by Justice Department economists in connection with the United States' action against Associated Milk Producers, Inc., for example, states flatly that the standby pool was unnecessary because prior to the pool the market was allocating milk supplies in response to consumer demand. *See* P. Eisenstat, R. Masson & D. Roddy, *An Economic Analysis of the Associated Milk Producers, Inc. Monopoly*, 454–55, 469.[16] Nonetheless, the report also acknowledges that the pool could serve the function of assuring available reserve supplies where local producers could not meet the fluid demands of consumers, *id.* at 469, and the consent decrees in the Justice Department litigation in fact allow continued participation in the standby pool. *See United States v. Associated Milk Producers, Inc.*, 394 F.Supp. 29, 54–55 (W.D.Mo.1975), *aff'd*, 534 F.2d 113 (8th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *United States*

---

**15.** The dairy cooperative in *Milk Producers Ass'n* lost its Capper–Volstead immunity because it had engaged in anticompetitive activities "far outside the 'legitimate objects' of a cooperative," including, *inter alia*, interfering with truck shipments of non-members' milk, boycotts, and the use of a prior debt to force a dairy to buy its milk. 362 U.S. at 468, 80 S.Ct. at 854. The cooperative also violated the antitrust laws by purchasing its major competitor for a price well beyond the value of the competitor's assets, where the purchase contract included an agreement by the former owners not to compete and to attempt to have all former producers join the cooperative or ship their milk to another market. *Id.* at 470–71, 80 S.Ct. at 855–56. The Court noted that while a purchase of assets for business use would be lawful and permitted under Capper–Volstead, this purchase was entered into by both parties with the specific intent and purpose of restraining trade by eliminating the largest purchaser of non-cooperative milk in the area; by forcing non-cooperative producers either to join the cooperative or ship to another market; by eliminating the cooperative's prime competitive dealer from government contract milk bidding; and by increasing the cooperative's control of the Washington D.C. market. *Id.* at 469, 472, 80 S.Ct. at 854, 856.

**16.** Other economists from the University of Wisconsin have criticized this analysis, noting that while milk was available, pricing was erratic and included both undercutting and gouging. *See* H. Cook, L. Blakley & C. Berry, *Review of Eisenstat, Philip, Robert T. Masson, and David Roddy "An Economic Analysis of the Associated Milk Producers, Inc. Monopoly,"* 25 (R2790 Research Bulletin, Research Division, College of Agricultural and Life Sciences, University of Wisconsin Madison) (hereafter *Research Bulletin*). The *Kinnett Dairies* Court found that the pool provided the means for obtaining dependable supplemental supplies at predetermined prices. 512 F.Supp. at 617.

*v. Mid–America Dairymen, Inc.*, 1977–1 Trade Cases (CCH) para. 61,509 at 71,984–85, 1977 WL 1425 (W.D.Mo.1977). The decrees expressly recognize a valid purpose of the pool is "establishing and maintaining a reserve supply of milk to fulfill the requirements of participating cooperatives." *Associated Milk Producers*, 394 F.Supp. at 55; *Mid–America Dairymen*, 1977–1 Trade Cases (CCH) at 71,985.[17]

The other articles offered by plaintiff also cite the value of a standby reserve supply of milk. Those written by Charles Farr, the "father" of the pool concept, refer to the marketing implications of the option contracts entered into by the pool, but also emphasize the reserve function:

> The reserve supply of unregulated milk serves a definite function for the fluid milk industry.... Here is a good dependable source of qualified milk ready to be tapped to supplement the supplies in markets which find themselves short of milk to meet fluid demands in the low production months.

C. Farr, *"An Approach to Handling Unattached Milk Supplies Through Establishment of A Standby Pool,"* 2 (April 14, 1965).

A 1973 report on ARSPC's performance presented to the Board of Directors of ARSPC concludes that ARSPC was performing this "reserve" function:

> Coordination through ARSPC has facilitated the sale of excess supplies of member milk to nearby markets when needed, and has provided members with a dependable and reasonably priced source of supplemental supplies when they were short. ARSPC has provided members a

means for adequately supplying their dealers, even when unexpected shifts in supply-demand relationships developed, without maintaining costly reserves in their pool during the times they weren't needed.

Standby Pool Cooperative Study Committee, *The Associated Reserve Standby Pool Cooperative Past Performance and Future Prospects*, vii (March 9, 1973) (hereafter *ARSPC Report*).

Plaintiff's suggestion that the percentage of unregulated milk under option was high and the percentage of options exercised was low does not create an issue of fact where the pooled milk did serve the function of providing additional supplies as needed in response to fluctuating consumer demand. As the *ARSPC Report* explains, more pool milk could have been shipped from 1970–72, but for reasons of efficiency and expediency, the ARSPC routing agent would first direct orders to members with available supplies nearest the buyer. Milk was shipped from the pool plants only when no closer supply was available. *ARSPC Report, supra*, at vii.[18] Moreover, reserve shipments at times were high, ranging up to two-thirds of the daily average reserve supply in the fall of 1972, for example. *Id. See* H. Cook, L. Blakley & C. Berry, *Review of Eisenstat, Philip, Robert T. Masson, and David Roddy "An Economic Analysis of the Associated Milk Producers, Inc. Monopoly,"* 25 (R2790 Research Bulletin, Research Division, College of Agricultural and Life Sciences, University of Wisconsin Madison).

---

**17.** In pleadings before the district court, plaintiff argued these decrees by implication evinced antitrust violations because they placed limits on the operation of the pool. Defendant argued on appeal that the limitations primarily concerned making the options available on a non-discriminatory basis, and are thus directed to competition between cooperative and proprietary manufacturers at the milk producer level. We agree with the district court's assessment that the consent decrees by their terms do not "constitut[e] evidence or admission by either party as to any issue of fact or law." *Mid–America Dairymen*, 1977–1 Trade Cases (CCH) at 71,-981. *See Associated Milk Producers*, 394 F.Supp. at 49. We nonetheless find it significant that

the decrees contemplate operation of the standby pool to serve a reserve function, clearly a "legitimate object" of a Capper–Volstead cooperative.

**18.** Three of the economists responsible for the *ARSPC Report* state further that while shipments initially had been small (ranging from 5 to 11 percent of supply), "[t]his seems to be the case with plants in any milk shed that are truly reserve plants. They are not called upon for shipments except whenever there are essentially unexpected shortages." *Research Bulletin, supra*, at 25.

As we stated in *NFO*, there is a "sometimes hazy line between lawful and unlawful monopolization efforts when undertaken by Capper–Volstead cooperatives," because such cooperatives may lawfully act to set prices and to gain sufficient control of milk to enable them to set higher prices. *NFO*, 687 F.2d at 1193. In view of the legitimate reserve function served by the pool and the lack of unlawful intent as specifically found by this Court and by other courts to have considered the operation of the pool, *see id.* at 1206–07; *Kinnett Dairies*, 512 F.Supp. at 615–17, 642–43, we conclude there is no genuine issue of fact concerning whether defendant's participation in the pool is an unlawful, predatory tactic as opposed to a "legitimate object" of a cooperative seeking to most effectively market its members' milk.

### IV.

The Capper–Volstead Act grants immunity to agricultural cooperatives to join together to set prices and otherwise market their products on behalf of their members, provided their organizations do not include non-farmers as members and their actions are not predatory. Plaintiff has failed to produce, in response to defendant's motion for summary judgment claiming Capper–Volstead immunity, evidence which creates a genuine issue of fact that the standby pool either included non-farmers as members or engaged in predatory conduct intended to stifle or smother competition. The undisputed evidence is that membership in both the ADI standby pool and ARSPC was limited to farmer-cooperatives. To advance their objectives, both pools entered into option contracts with proprietary dairies, but the proprietary plants did not in any way participate in the management of the pool and the volume of milk under contract with cooperatives always exceeded that under contract with the proprietaries. Moreover, there is no evidence of any coerced participation in the pools; participation was voluntary, and while the options may have enhanced the cooperatives' ability to set prices, the pool served the legitimate purpose of providing an adequate reserve supply to meet fluctuations in consumer demand for fluid milk. For these reasons, we find the district court correctly granted summary judgment in favor of defendant, and the district court's decision granting Capper–Volstead immunity to defendant in this case is affirmed.