**AGMAX, INC., Plaintiff,**

v.

**COUNTRYMARK COOPERATIVE, INCORPORATED, Defendant.**

**No. IP92–639C.**

United States District Court, S.D. Indiana, Indianapolis Division.

May 15, 1992.

Ronald E. Elberger, Bose McKinney & Evans, Indianapolis, Ind., for plaintiff.

Donald E. Knebel, Lynn C. Tyler, Barnes & Thornburg, Indianapolis, Ind., for defendant.

## ENTRY

BARKER, District Judge.

This matter comes before the court on Agmax's motion for a temporary restraining order. Inasmuch as Countrymark Cooperative, Incorporated ("Countrymark") has acknowledged receipt of notice of this motion, the court will treat it as a motion for a preliminary injunction. *See Government Suppliers Consol. Servs., Inc. v. Bayh*, 734 F.Supp. 853, 861 (S.D.Ind.1990); Wright & Miller, *Federal Practice and Procedure*: Civil § 2951. Having heard evidence on this motion on May 13, 1992, and having read the briefs submitted by both parties, the court now sets forth its findings of fact and conclusions of law in accordance with Rules 52 and 65 of the Federal Rules of Civil Procedure.

Plaintiff AgMax is an Indiana agricultural cooperative corporation with its principal place of business in Frankfort, Clinton County, Indiana. Agmax is owned by its farmer-patrons. Prior to September 1, 1991, AgMax was a member of the Indiana Farm Bureau Cooperative Association, Inc. ("IFBCA"), an Indiana-based wholesale agricultural marketing and supply cooperative.

On September 1, 1991, IFBCA merged with Countrymark, Inc., an Ohio corporation, in order to form a tri-state (Indiana, Michigan and Ohio) agricultural cooperative. Defendant Countrymark was the surviving corporation of this merger. Countrymark is a not-for-profit wholesale agricultural marketing and supply cooperative.

Its stock is owned by several retail agricultural cooperatives, and the stock of these retail cooperatives is owned either by individual farmers or entities through which individual farmers conduct their business.

AgMax's opposition to the IFBCA/Countrymark merger resulted in litigation between it and the IFBCA. During the pendency of this litigation, AgMax held a series of meetings in November, 1991. As reported in an article entitled "Local control of farmer-owned co-ops essential!" in the Winter 1991–1992 issue of *AgMax AgNews*, Defendant's Exhibit B, the question arose during one of these November meetings "if AgMax would continue to sell Co-op Petroleum products, if it is allowed to withdraw from the regional co-op...." Defendant's Exhibit B, p. 14. AgMax general manager Steven K. Vrooman was quoted as having answered yes, and further that "[i]f being a voting member of Countrymark is a requirement of handling Co-op Fuel, then we can always become a member through merger with another local co-op that is still a member." *Id.*

On April 2, 1992, the Montgomery Circuit Court entered a declaratory judgment that AgMax did have dissenter's rights with respect to its voting common stock, class B preferred stock, patron's equity account and general reserves. (Portions of that decision are currently on appeal.) Prior to this April 2nd decision, AgMax was a member cooperative of Countrymark and purchased petroleum and fuel products from the defendant for resale to AgMax customers. As of April 2, 1992, however, AgMax was no longer a member of Countrymark.

A series of correspondence between the parties began soon thereafter. On April 13, 1992, Countrymark sent AgMax a letter informing AgMax that it would no longer sell products or supply services to AgMax, although Countrymark offered to resume selling petroleum products to AgMax for a period of at most thirty days and in an amount not to exceed the amount sold to

AgMax during the same time period one year earlier. On April 16, 1992, AgMax sent Countrymark a letter accepting the offer because, AgMax wrote, it had no alternatives at that point in the middle of the planting season [1] and no other supply sources. Countrymark wrote to AgMax on April 17, 1992, informing AgMax of possible alternative supplies of No. 2 diesel fuel. AgMax responded to Countrymark with a letter dated April 23, 1992, in which AgMax noted that there were no alternative sources of products meeting the specifications of Super Dieselex-4, leaded plus regular gasoline, and leaded plus gasoline with ethanol (Countrymark's "proprietary products").

In the meantime, on and after April 14, 1992, AgMax placed orders with DeKalb Agra, Inc. ("DeKalb"), an Indiana agricultural cooperative and Countrymark member, for the purchase of certain quantities of Countrymark's proprietary products. DeKalb informed Countrymark of its intention to purchase such products for resale to AgMax. William Paddack, senior vice president of Countrymark, informed DeKalb that Countrymark would not sell any products to DeKalb which were intended for resale to AgMax. In a letter dated April 17, 1992, Countrymark informed its members, including DeKalb, of three new policies regarding "Membership Application and Acceptance," "Member Termination," and "Conditions of Membership." AgMax alleges that as a result of these policies, Countrymark members, including DeKalb, will not sell Countrymark products to AgMax for fear of losing their Countrymark membership.

Also after April 2, 1992, Frontier Co–Op, Inc., a Countrymark member from Indiana, solicited business from AgMax members and non-member customers.

Countrymark continues to sell certain of its products to non-members other than AgMax. However, with respect to Countrymark's proprietary products, Countrymark sells these only to members, who in

---

1. The parties have stipulated that the Indiana corn and soybean season extends until the end of May.

turn sell such products to non-members other than AgMax. Ronald Stover, vice president of Countrymark's petroleum division, testified at the May 13th hearing that no member cooperative was supposed to sell Countrymark's proprietary products to resellers. Stover stated that a distinction was drawn between the three proprietary products and other Countrymark products because a large sum of money had been spent in developing these products for farmers.

By letter (Defendant's Exhibit E) dated May 4, 1992 (at which point AgMax's 30–day petroleum supply from Countrymark was nearing exhaustion), AgMax initiated a survey of its petroleum customers as to what actions AgMax should take with respect to its petroleum business. The first line of the survey card which the customers were to return to AgMax read as follows: "OUR ALTERNATIVES ARE LISTED BELOW. PLEASE RANK THEM IN ORDER OF YOUR PREFERENCE." In addition to a blank space for "Other Ideas," the survey card listed four options: "Petition the Court to order Countrymark to continue selling to AgMax;" "Distribute the same Co-op products as an agent for another County Co-op;" "Sell our petroleum business to another County Co-op;" and "Switch to another petroleum source of equal quality such as Amoco."

Sales of Countrymark products represent approximately $6 million of AgMax's total sales volume of $106 million. However, such petroleum sales constitute about one-third of AgMax's total earnings. AgMax has submitted the affidavits of a number of farmers who currently purchase fuel from AgMax but have indicated that they would switch suppliers if they could not purchase Countrymark products from AgMax.

Based on these facts, AgMax alleges in its Verified Complaint that Countrymark has acted in combination and conspiracy with its members to eliminate AgMax as a supplier of Super Dieselex–4 diesel fuel, Leaded Plus gasoline, and Leaded Plus gasoline with ethanol, unique gasolines and fuel which AgMax maintains define the relevant product market, in "the geographical areas in which AgMax conducts business and has ... distributed such products," Verified Complaint, para. 22, which AgMax identifies as the relevant geographical market. AgMax further alleges that Countrymark's actions constitute violations of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1,[2] § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2,[3] Ind.Code § 24–1–2–1,[4] and Ind.Code § 24–1–2–2.[5] Inasmuch as the parties agree[6] that the state antitrust statutes are patterned after the federal statutes cited, "the analysis of plaintiff's claims under federal law is equally applica-

2. 15 U.S.C. § 1 provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal."

3. 15 U.S.C. § 2 provides in relevant part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...."

4. Ind.Code § 24–1–2–1 provides in relevant part: Every scheme, contract, or combination in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce, ... or to limit or reduce the production, or increase or reduce the price of merchandise or any commodity, or to prevent competition in manufacturing, within or without this state, is illegal, but this chapter may not be construed to apply to or repeal, modify or

limit, or make unlawful any of the powers, rights or privileges now existing or conferred by law upon any person.... However, it is a defense to any action growing out of any violation or any law relating to the subject-matter of this chapter for the defendant to prove that the violation is not in restraint of trade or commerce, or does not restrict trade or commerce, limit or reduce the production, or increase or reduce the price of merchandise or any commodity, or prevent competition in manufacturing.

5. Ind.Code § 24–1–2–2 provides: "A person who monopolizes any part of the trade or commerce within this state commits a Class A misdemeanor."

6. Memorandum of Law in Support of Agmax's Verified Motion for Temporary Restraining Order ("Plaintiff's Brief"), p. 9; Countrymark's Memorandum in Opposition to Agmax's Motion for Temporary Restraining Order ("Defendant's Brief"), p. 11.

ble to its state claim[s]." *Bi–Rite Oil Co. v. Indiana Farm Bureau Co-op. Ass'n*, 720 F.Supp. 1363, 1378 (S.D.Ind.1989), *aff'd*, 908 F.2d 200 (7th Cir.1990); *see also Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 721 n. 27 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *BeerMart, Inc. v. Stroh Brewery Co.*, 633 F.Supp. 1089, 1105 (N.D.Ind.), *rev'd on other grounds*, 804 F.2d 409 (7th Cir.1986).[7]

The injunctive relief sought by the plaintiff is in essence an order requiring Countrymark to continue to supply AgMax with fuel and petroleum products as it has in the past. To obtain such relief, AgMax must establish that:

1) no adequate remedy at law exists;

2) the moving party will suffer irreparable harm absent injunctive relief;

3) the irreparable harm suffered absent injunctive relief outweighs the irreparable harm the respondent will suffer if the injunction is granted;

4) the moving party has a reasonable likelihood of prevailing on the merits; and

5) the injunction will not harm the public interest.

*Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir.1990). "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir.1984).

1. The Adequacy of a Remedy at Law

The absence of an adequate remedy at law is a precondition to any form of equitable relief. . . .

In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered.

*Id.* at 386.

■ In its opening brief, the plaintiff argued that it had no adequate remedy at law because:

> Countrymark is the sole producer and source of the Fuels [Countrymark's proprietary products] in the relevant geographical market. . . . If AgMax is unable to obtain the Fuels from Countrymark or any of Countrymark's member cooperatives, AgMax cooperative members who depend upon a continuous, uninterrupted supply of Fuels may experience injury during the critical planting season. Its current customers will purchase the Fuels from other sources, if available. . . . Furthermore, the removal of AgMax as an independent, "non-member" supplier of the Fuels will alter the competitive balance in the marketplace, perhaps permanently. The damage to the plaintiff's reputation as a competent, full service supplier of agricultural products in the Relevant Geographical Market will be irreversible.

Plaintiff's Brief, p. 5.

It is difficult to distill from such allegations exactly why a remedy at law would be inadequate in this case. Many of the allegations pertain to the irreparability of the harm faced by the plaintiff and will thus be discussed later.[8] Likewise, the fact that the competitive balance might be altered pertains not to the adequacy of a remedy at law but instead perhaps to the public interest. Moreover, while some of AgMax's customers are the cooperative members who own AgMax, these individual farmers are not plaintiffs in this cause, so the relevance of the possibility that they

---

**7.** Actually, the cases cited by the parties discuss Ind.Code § 24–1–2–*1* and do not specifically establish that Ind.Code § 24–1–2–*2* is patterned after federal law. However, the parties agree that federal law provides guidance with respect to the interpretation of both state law provisions, and the court has found no authority to suggest that their interpretation, at least as applied to the facts of this case, is erroneous.

**8.** The elements of the adequacy of a remedy at law and the irreparability of harm to the plaintiff are analytically distinct in cases involving prayers for injunctive relief. *Roland*, 749 F.2d at 386.

might have to turn to other suppliers is unclear. Even if the consequences to Ag-Max cooperative members were relevant to the issue of the adequacy of a remedy at law (or the irreparability of harm to the plaintiff, for that matter), the plaintiff has not presented any evidence establishing that the result of Countrymark's cutoff of AgMax would actually be detrimental to the farmers.

Returning to the issue of the adequacy of the plaintiff's remedy at law, the best that the court can distill about the plaintiff's argument on this point from its briefs and arguments at the hearing is that damages would be an inadequate remedy because Countrymark's cutoff would drive AgMax out of the farm petroleum market and would damage its reputation as a supplier of agricultural products. Since the plaintiff offered no evidence to establish that its reputation would be damaged in any significant way,[9] this alleged harm is too speculative to support a finding that the plaintiff has no adequate remedy at law.

The question then remains of whether some aspect of the business that the plaintiff claims that it will lose is not compensable by monetary damages. The court notes that the fact that the plaintiff was able to include a damages figure in its Verified Complaint undercuts its argument that it has no adequate remedy at law.

> In principle, any profits lost ... as a result of being terminated ... can be monetized, and awarded as damages; but in practice it may be very difficult to distinguish the effect of termination from the effect of other things happening in the same time, and to project that effect into the distant future.

*Roland*, 749 F.2d at 386. In this case, however, AgMax general manager Steven K. Vrooman testified at the May 13th hearing that AgMax had records indicating the number of customers to whom AgMax sold Countrymark proprietary products and the amounts of such products that were sold. Moreover, Vrooman testified that Countrymark petroleum sales constitute roughly $6 million of AgMax's total sales volume of $106 million, and that such sales represent roughly one-third of AgMax's total earnings. In light of this testimony, and since the plaintiff has not established how the lost Countrymark petroleum business is otherwise incapable of being reduced to monetary damages, it would appear that the plaintiff has an adequate remedy at law.

One last argument on this point remains. The plaintiff argued that it would suffer an irreparable harm as a result of the loss of customers "who will leave AgMax if Ag-max is not a full-service cooperative." Putting aside for a moment the question of whether this constitutes irreparable harm (an issue which will be addressed below), the plaintiff cited *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711, 724 (S.D.N.Y.), *aff'd per curiam*, 417 F.2d 621 (2nd Cir.1969), for the proposition that "it would be impossible to estimate or to compute damages for the loss of good will it will suffer as a result of being unable to provide its retail customers with products." However, in *Interphoto*, the court noted that the "plaintiff ha[d] already received complaints about the possible absence of [defendant's] goods from its inventory, accompanied by threats to do business elsewhere." *Id.* at 724, no. 8. In this case, while the plaintiff submitted the affidavits of various customers who testified that they would seek out other suppliers of fuel if AgMax could not meet their needs, none of the affidavits established that those customers who were AgMax members would leave the cooperative, or that non-member customers would not patronize AgMax to purchase other goods. What the plaintiff has thus established is the potential loss of its petroleum business, and as discussed above, the plaintiff has not established that this loss is not compensable monetarily.

9. The allegations on this point in the Plaintiff's Brief, p. 5, simply assumed that such damage would occur. No discussion was given as to the extent of that damage. Moreover, no allegation of harm to the plaintiff's reputation was made either in the Verified Complaint or the Verified Motion for Temporary Restraining Order.

The availability of an adequate remedy at law signifies in and of itself that the plaintiff is not entitled to a preliminary injunction. However, other factors support this result as well.

### 2. Irreparable Harm to the Plaintiff

■ Irreparable harm has been defined as "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland,* 749 F.2d at 386. AgMax refined its contentions on this point in its Supplemental Memorandum in Support of AgMax's Verified Motion for Temporary Restraining Order ("Plaintiff's Supp."), in which it alleged that, by the end of the spring growing season and absent a restraining order, "Countrymark will have succeeded in driving AgMax from the farm petroleum market," p. 6, and further (as noted above) that "[t]he specific irreparable harm to AgMax is the loss of farmer/customers who will leave AgMax if AgMax is not a full-service farm cooperative." Plaintiff's Supp., pp. 7–8.

Since the court has concluded that AgMax has an adequate remedy at law for the loss of its Countrymark farm petroleum business, that harm, even in light of the rapidly approaching end of AgMax's Countrymark fuel supply and the Indiana growing season, is not irreparable since it can be "fully rectified by the final judgment after trial." *Roland,* 749 F.2d at 386.

While AgMax has attempted to paint the loss of the Countrymark petroleum business as a threat to the entirety of AgMax's operation, it has not provided evidence above the level of speculation this loss would be the death knell for the cooperative altogether. Moreover, the fact that AgMax listed the sale of its petroleum business to another county cooperative in response to Countrymark's cutoff as an option for its members to consider in the May 4th survey undercuts AgMax's argument that the loss of this business would be irreparable. Whether this option is or was viable or not, the fact that it was suggested by AgMax to its customers signifies that AgMax does not consider its petroleum business to be essential to its survival as a cooperative.

The Seventh Circuit's decision in *Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.,* 841 F.2d 163 (7th Cir.1988), is instructive on the issue of the irreparability of a plaintiff's potential business losses. Although *Classic Components* dealt with the propriety of an injunction pending appeal, the court relied on cases involving the propriety of issuing preliminary injunctions, and the facts in *Classic Components* are similar to the facts in the instant case. In *Classic Components,* 841 F.2d at 164, a plaintiff whose distributorship with a defendant manufacturer had been terminated merely stated that its customers had begun to cancel their orders for the defendant's products, that this business would be lost to the plaintiff in the event of an interruption of the business agreement between the parties, and that the plaintiff's entire customer base was threatened thereby. The Seventh Circuit rejected out of hand the argument that such an injury warranted injunctive relief: "Injuries of this sort, common consequences of broken contracts, yield damages. An injury compensable in money is not 'irreparable,' so an injunction is unavailable." *Id.* at 164–165. AgMax has not distinguished its situation from that of the distributor in *Classic Components.* Moreover, while the Seventh Circuit noted that an exception to this principle in "that a terminated supply arrangement may create irreparable injury if the interruption bids fair to propel one firm into bankruptcy and frustrate later attempts to compute or collect damages," *id.* at 165, AgMax has not produced evidence demonstrating that such an exception would apply in this case.

The question thus becomes whether the plaintiff has established something other than the loss of its farm petroleum business as an irreparable harm. The answer sought by the plaintiff is not to be found in the potential loss of customers. As noted above, AgMax has not offered evidence to establish that customers would actually leave the cooperative as opposed to looking elsewhere to satisfy their fuel needs alone.

The only other harm asserted by AgMax is that "[i]f AgMax is unable to obtain the Fuels from Countrymark ..., AgMax cooperative members who depend upon a continuous, uninterrupted supply of Fuels may experience injury during the critical spring planting season. Its current customers will purchase the Fuels from other sources, if available." Plaintiff's Brief, p. 5. Aside from the fact that the need to switch supplies is a harm allegedly suffered by the customers, not the plaintiff, the fact that other supplies are available makes this harm seem ephemeral rather than irreparable.

### 3. The Balance of Harms

■ While the plaintiff has failed to establish irreparable harm or harm that cannot be remedied at law, that does not mean that the plaintiff has established no harm at all. The defendant suggests that no serious harm will come to AgMax by noting that AgMax offered three options (besides the one that essentially prompted this litigation) to its customers on its May 4th survey. However, having heard the testimony of Steven Vrooman, the court finds that the options presented were more hypothetical than viable alternatives. Vrooman testified at the May 13th hearing that AgMax had no other options but this litigation to continue in the farm petroleum business. It thus appears that some harm, albeit not irreparable, will befall AgMax should a preliminary injunction not issue.

This harm is balanced against the harm on Countrymark's part should the court order it to continue supplying AgMax at least through the end of this growing season. No evidence suggests that AgMax was a poor customer, or that to continue to supply AgMax would strain Countrymark in terms of finances or resources. The one harm that Countrymark would conceivably suffer is that the existence of a free rider, meaning a non-member receiving the benefits of cooperative membership, would undermine the incentive of other cooperatives to join and/or remain members of Countrymark. In the circumstances of this case, however, that argument carries little weight, as the request currently before the court is one for a preliminary, not a permanent, injunction to operate on a very short-term basis, so that long-term market effects are not at issue.[10]

The fact that the balance of harms, if all potential harms to AgMax are considered, weighs in the plaintiff's favor, will not cure the plaintiff's failure to establish that it will suffer irreparable harm for which damages are inadequate. Moreover, as will be seen below, the plaintiff's likelihood of success, analyzed at this point in the litigation only, is so small that the balance of harms factor is not sufficient to tilt the balance in favor of the issuance of a preliminary injunction.

### 4. The Reasonable Likelihood of Success on the Merits

"Equity jurisdiction exists only to remedy legal wrongs; without some showing of a probable right there is no basis for invoking it.... [T]he threshold is low. It is enough that 'the plaintiff's chances are better than negligible....'" *Roland*, 749 F.2d at 387 (quoting *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982)).

The defendant argues that AgMax has no likelihood of prevailing on the merits because Countrymark, as an agricultural cooperative, is exempted from the operation of the antitrust laws by § 6 of the Clayton Act, 15 U.S.C. § 17, and § 1 of the Capper–Volstead Act, 7 U.S.C. § 291.[11] Accordingly, Countrymark contends, it cannot illegally conspire with its members as a member of law. AgMax, on its part, takes the position that Countrymark's actions, and specifically the pressure that it puts on its members, such as DeKalb, to refrain from selling proprietary products to Ag-

---

10. Should Countrymark be concerned about what its continued supply of its proprietary products to AgMax would signal to other cooperatives, all it would have to do would be to publish the court order compelling it to do so.

11. A similar state law exemption is found at Ind.Code § 15–7–1–27.

Max, fall outside the scope of the statutory exemptions for agricultural cooperatives.

Analyzing the immunity accorded to agricultural cooperatives under the Capper–Volstead Act, Justice Black, writing for a unanimous Court, noted that the legislative history:

> indicates a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws. It does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers, processors or dealers....

*Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 466–467, 80 S.Ct. 847, 853, 4 L.Ed.2d 880 (1960).

■ Countrymark is immune from liability under the Sherman Antitrust Act for conspiring with its members or monopolizing a given market unless such anticompetitive actions constitute predatory practices. *See Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1044–1045 (2nd Cir. 1980), *cert. denied*, 454 U.S. 818, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981); *United States v. Dairymen, Inc.*, 660 F.2d 192, 194–195 (6th Cir.1981) (per curiam), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Although the Sixth Circuit defined predatory practices as "anticompetitive practices without any business justification," *id.*, 660 F.2d at 194, the analysis of exactly which sorts of behaviors are predatory has proven problematic. *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F.Supp. 608, 631 n. 31 (M.D.Ga.1981), *aff'd*, 715 F.2d 520 (11th Cir.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984).

This court need not and will not ultimately resolve that question as applied to the facts of this case on a motion for preliminary injunction. The court need only address whether the plaintiff has established more than a negligible chance of success on the merits. AgMax argues that Countrymark's refusal to sell (or allow the sale to it of) Countrymark's proprietary products is motivated by a desire to drive AgMax out of the farm petroleum market. Countrymark, through its senior vice president William Paddack, maintains that it invested significant sums in developing the proprietary products for its farmers, that it does not want to support competition with its members, and that it wants its members to be financially strong. Whether Countrymark's desire to limit the availability of its proprietary products is designed to increase incentives for non-members to join and/or to eliminate competition from non-members is a close question, particularly in light of Paddack's testimony. However, since the question is a close one, the court concludes that the immunity provided under the Clayton and Capper–Volstead Acts does not so clearly resolve AgMax's claims as to leave AgMax with only a negligible likelihood of success.

Turning to an analysis of the antitrust provisions cited by the plaintiff, the plaintiff correctly notes, Plaintiff's Brief, p. 9, that whether a violation of § 1 or § 2 of the Sherman Antitrust Act has occurred is to be analyzed according to the "rule of reason." "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557 53 L.Ed.2d 568 (1977) (footnote omitted).

### A. Section 1 of the Sherman Antitrust Act

To establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged....

*McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 (9th Cir.1988).

Countrymark argues that the first of these elements cannot be established based solely on its alleged threats to its members to terminate their membership if they sell Countrymark fuel products to AgMax. As the Sixth Circuit noted in *Int'l Logistics Group v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir.1989), the conspiracy element cannot be established where a defendant acted "independently in formulating and implementing its ... marketing policies." AgMax has offered no evidence that Countrymark worked with any other entity in formulating the fuel cutoff policy of which AgMax now complains. "Current legal precedent supports the conclusion that a conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source" *Id.* That is exactly the explanation given by the plaintiff to explain DeKalb's refusal to supply it with Countrymark proprietary products.

AgMax's position is that "[i]t is sufficient if persons with knowledge that a concerted action is contemplated and invited give adherence to and participate in the scheme." Plaintiff's Brief, p. 11. In support of that proposition, the plaintiff cites *Standard Oil Co. v. Moore*, 251 F.2d 188, 211–212 (9th Cir.1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). However, *Moore* distinguished between a denial of service "pursuant to an agreement, combination, or conspiracy ..., rather than as a result of a legitimate business decision, independently arrived at, unassociated with any such mutual arrangement or deliberate concert of action." *Id.* at 206. AgMax has not offered evidence of any other entity working in concert with Countrymark with the intent to remove AgMax from the farm fuel market, in contrast with *Moore*, where the record contained evidence indicative of concerted action. That DeKalb does not share Countrymark's alleged intent to drive AgMax out of the farm fuel market is established by paragraph eight of the Affidavit of Carl Feller, general manager of DeKalb, wherein Feller testifies that DeKalb is willing to sell Countrymark fuel to AgMax should the court so permit.

Because of its failure to adduce evidence at this point of a conspiracy or agreement, AgMax has not established a likelihood of success on its § 1 claim. Its likelihood of prevailing on that claim is further undermined by its reliance on a questionable definition of the relevant market in this case. The problematic aspect of AgMax's definition will be discussed in connection with the analysis of AgMax's § 2 claim; however, the definition of the relevant market is material to the § 1 analysis as well because AgMax must establish injury to competition in a given market.

### B. Section 2 of the Sherman Antitrust Act

The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident.... The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). AgMax contends that, with its elimination, Countrymark would, directly and through its members, control all of the relevant market. Plaintiff's Brief, p. 17.

The plaintiff's likelihood of success on its § 2 claim is undermined by its reliance on a tenuous definition of the relevant market in this action. The definition of a market has two parameters. One is the product market, which AgMax describes in this case as Countrymark's proprietary products (the Dieselex–4 fuel, Leaded Plus gasoline, and Leaded Plus gasoline with ethanol). *See* Plaintiff's Brief, p. 7, n. 2. The other is the geographic market, which AgMax describes as the areas in which it conducts business. *Id.* at 5.

Countrymark disagrees with AgMax's position on both the product and geographic markets. AgMax has adduced evidence that Countrymark is the sole supplier of

the three products included in its definition, and that no other source of products with the same specifications has been found. Countryark has offered evidence and authority to refute the idea that its proprietary products are so unique as to define a market. The court will not resolve this issue now, however, except to note that AgMax has proffered enough evidence to show more than a negligible likelihood of success on this issue.

AgMax's definition of the relevant geographic market is more problematic. As noted above, AgMax defines this market as where its customers are located. Verified Complaint, para. 22. However, "[a] relevant geographic market is defined as the area of effective competition within which the seller operates and to which the purchaser can practically turn for supplies." *G. Heileman Brewing Co. v. Anheuser–Busch Inc.*, 676 F.Supp. 1436, 1474 (E.D.Wis.1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989). Countrymark is, as noted early in this entry, a tri-state cooperative based in Ohio but operating in Indiana and Michigan as well. AgMax has offered no persuasive argument as to why the relevant geographic market should be limited to the area which its customers reside. Indeed, AgMax merely asserted in its Plaintiff's Brief, p. 16, that it would be "cost prohibitive" to transport fuel and petroleum products over "extreme distances" without defining those terms or offering evidence that would support this assertion. Since it based its argument about Countrymark's monopoly power on the existence of this narrowly-defined geographic market, AgMax's § 2 claim is at this point seriously flawed.

Moreover, while AgMax maintains that a measurement of Countrymark's monopoly power should be made based upon statistical data concerning Countrymark's market share, Plaintiff's Brief, p. 17, an examination of Countrymark's share of the Indiana market for various products does not necessarily indicate monopoly power. Defendant's Exhibit F, the Affidavit of Ronald D. Stover, Countrymark vice president of petroleum, plus the exhibits attached to the affidavit, provide statistics on Countrymark's share of various Indiana gas and petroleum markets. The court will not comment on these statistics except to note that they fall far short of the 100% market share for Countrymark that AgMax asserted based on its overly-narrow definition of the relevant geographic market.

AgMax also argues that Countrymark violates § 2 under the "essential facilities doctrine."

The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonable to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132–1133 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Unlike *MCI*, where the plaintiff sought access to the defendant's distribution facilities, a cursory reading of the plaintiff's Verified Complaint reveals that AgMax seeks access to Countrymark's proprietary products and not the facilities by which it produces and distributes them. Moreover, AgMax's failure to provide any evidence to establish the elements listed above shows this theory of § 2 liability to be meritless.

In sum, the plaintiff's failure to support essential elements of its antitrust claims result in the conclusion at this point in the litigation that AgMax has not established a likelihood of success on the merits.

### 5. The Public Interest

"Sometimes an order granting or denying a preliminary injunction will have consequences beyond the immediate parties. If so, those interests—the 'public interest' if you will—must be reckoned into the weighing process...." *Roland*, 749 F.2d at 388. It is conceivable that the court's decision will have some impact on third parties. However, no evidence was presented on this point by either party. To the extent that the farmer members of AgMax are treated as third parties, the

denial of AgMax's motion would necessitate their turning elsewhere for fuel supplies, although the plaintiff did not establish that this would be a significant problem. Other actual competitive effects to be achieved by ordering Countrymark to supply AgMax with its proprietary products are far from clear at this point. Accordingly, consideration of this factor has not assisted the court's resolution of the question of whether the plaintiff's motion for a preliminary injunction should be granted.

## CONCLUSION

The plaintiff has failed to establish the elements that justify the issuance of a preliminary injunction. The plaintiff's injuries are not irreparable, and an adequate remedy exists for them at law. Moreover, the plaintiff's likelihood of success, as analyzed at this early point in the litigation, is negligible. Accordingly, the plaintiff's motion for preliminary injunctive relief is denied.

It is so ORDERED.